## ROUNDS & HAGLER v. AIKEN MFG. CO.

1. ARBITRATION AND AWARD.—Contractors bid lump price for certain work, and same ratio for additions and alterations, upon submission to arbitrators to ascertain price of additional work, they must necessarily calculate from this data prices bid on original work so as to obtain prices bid for additional work.

2. Ibid.—Waiver.—Finding that appellant had notice of meeting of umpire with arbitrators sustained; but if not, his right to object is waived by afterwards presenting himself before full board without objecting to former action, of which he then had notice.

3. Ibid.—Umpire can take facts from arbitrators as found by them, and not call and re-examine witnesses.

4. Ibid.—Under facts here, signing award by two arbitrators, and sending proof sheet to appellant, and umpire afterwards signing on next day, upheld.

5. Ibid.—Witnesses.—Under common law, arbitrators have no right to administer oath to witnesses, but such act does not invalidate award.

6. Ibid.—Finding as to number of brick calculated to build wheel pit, &c., and that painting and iron account was considered and included in award, sustained.

7. Ibid.—Arbitrators are not bound by the strict rules of the law in receiving evidence.

8. Ibid.—Allowance by arbitrators of less than amount paid by contractors for ventilators failing to come up to contract specifications, sustained, under power given them to charge contractors with omissions.

9. Ibid.—Finding as to estimate of brick contracted to be used and amount actually used in wheel pit, &c., sustained.

10. Ibid.—An award will not be set aside because arbitrators seem to have made mistake in calculations, or because they did not accept views presented by either side.

11. Ibid.—The presence of an agent of respondent during deliberations of arbitrators, in part provided for in submission, and his assistance in calculations at their request, will not vitiate an award in absence of harm shown to arise therefrom.

12. Ibid.—Awards will not be set aside except for fraud, gross partiality, collusion, or of mistake by which award is made to operate other than as designed.

13. Ibid.—Where arbitrators are empowered to do substantial justice, they may reduce amount admitted to be due one party by the other, where such admission is found to be based on mistake.

14. Ibid.—An error in putting in an award one item only, vitiates award *pro tanto.*

15. Ibid.—Under submission here, arbitrators had the right to charge appellants with wood and lumber paid for by respondents, to be used by appellants in constructing the buildings.

Before Benet, J., Aiken, July, 1899.    Affirmed.

Action to set aside award by Rounds & Hagler against Aiken Manufacturing Co. From decree dismissing complaint, plaintiffs appeal.

*Messrs. W. T. Gary* and *G. W. Croft & Son,* for appellants, cite: *Arbitrators had no power to reassess all the work:* 34 Vt., 121; 2 Hays, 94. *Parties should have notice of calling in of umpire:* 1 Brev., 208; 11 Allen, 377; 15 A. R., 522; 35 A. D., 591; 4 Dall., 271, 232; 8 Pet., 178. *No waiver of such right by afterward appearing:* 57 N. Y., 479. *Rule for reversing findings of fact:* 54 S. C., 202. *Error to have agent of respondent with arbitrators in absence of other side:* 6 Ves., Jr., 70; 86 Ga., 337. *As to when awards will be set aside:* 2 Bay, 372; 2 Story Eq., 675; 4 Pick., 192; 6 Id., 269; 4 Mass., 41; 5 Id., 435; 15 Id., 365; 5 Cow., 106; 13 N. H., 72; 2 Col., 74; 1 McC., 483.

*Messrs. Hendersons,* contra, cite: *Not necessary for umpire to call in witnesses:* 12 Ves., 412; 2 Bail., 113; 1 Brev., 208.

*Mr. J. R. Lamar,* also contra, cites: *It is proper for arbitrators to delegate ministerial work:* 119 U. S., 1. *And objection comes too late after award:* 91 Ga., 348; 86 Ga., 337.

July 27, 1900. The opinion of the Court was delivered by

MR. JUSTICE POPE. This action was commenced on the 1st day of June, 1898. I do not know that any words of mine would more accurately describe how the action was, in the opinion of the plaintiffs, rendered necessary, with the grounds for that opinion, than by adopting those employed by the Circuit Judge, Judge Benet, in his well considered opinion. Hence I will reproduce the text of that decree:

"The defendant, the Aiken Manufacturing Company, a corporation by and under the laws of this State, having organized to do business as manufacturers of cotton goods, at Bath, in the county and State aforesaid, determining to erect a brick structure, or cotton factory, at said place, and having

advertised for competitive bids for the erection of said build-
ings and appurtenances, the plaintiffs, on March 11, 1895,
filed with the defendant's agent a bid in writing, to do the
work according to the plans and specifications that had been
previously prepared by an architect and which had been ex-
amined by the plaintiffs; said bid, together with the pencil
memorandum, known in the case as the 'Barrett memoran-
dum' (and which will be herein referred to) shows that the
plaintiffs undertook to do the work required on the original
mill and appurtenances for the lump sum of $53,198; said
bid so modified by the Barrett memorandum, passed into a
written agreement, which was made and executed by the
parties on March 16, 1895, which paper is the contract in the
case. It is noteworthy that there is not a thing set forth in
the contract going to show at *what price* the plaintiffs were to
furnish lumber or *materials* of any kind, except as set forth
in the 19th section of said article, that the brick were to be at
$4.25 per M., on an estimate that it took 2,000,000 of brick
to complete the work. There is nothing in the contract
going to show on what basis the plaintiffs estimated that they
should be paid for laying *brick,* either in Portland or Rosen-
dale cement, or lime. It is further agreed that all extra
work should be paid for in proportion to the work in the
original contract, and section 26 provides that no payment on
account by the owners shall be deemed a waiver of the right
to object to defective material or imperfect work. The work
under the contract progressed, and as it progressed, extra
additions were agreed to be made to the mill and to the work,
all under the same contract, and the builders, or plaintiffs,
went on to carry out the same. Payments were made to
them from time to time, and it is unquestioned that much
more than the original contract price was paid to them.
After the work was completed, dispute arose as to the
amounts due to the plaintiffs by the defendant, and in order
to settle said disputes without litigation, an agreement in
writing was entered into by the parties to submit the same to
arbitration. The terms of said agreement are important.

The preamble recites, that whereas, the contract aforesaid provides: 'That any dispute or difference concerning the meaning and construction of the plans, drawings, or specifications, as to what is extra work, shall be decided by the architect.' And whereas, in the specifications it is provided that 'in case any dispute arises, respecting the *true value* of the extra work, or of work *omitted,* at the request of the owner, the same shall be *valued* by two competent persons, one employed by the owner and the other by the contractor, and those two to have power to name an umpire, whose decision shall be binding upon all parties.' And whereas, a controversy is pending 'in relation to the *price* to be paid by said company to said Rounds & Hagler for certain *extra work* done and performed by said Rounds & Hagler for said company upon their mill and canal and other structures at Bath, and also for *material* furnished by said Rounds & Hagler in doing such work, and *deductions* for work omitted.' Then the matter in dispute is submitted to the arbitrament and award of arbitrators to determine 'the *price* to be paid for such *extra and additional* work, and *material* furnished, or of the amount to be *deducted* for *omissions* by them in the erection and building of the Aiken Manufacturing Company's mill, its canal and other structures, at Bath, S. C.' It is agreed further, that the builders shall nominate one of said arbitrators and the owners another; those two are called in the submission, arbitrators, and they are given 'power to nominate an *umpire*'—he is called an umpire in the submission. It is further provided: 'The award of any *two* shall be final and binding upon the parties.' And there is no provision in the submission as to *when* the award is to be made, as to *how* it is to be published, or *what* notice, if any, is to be given to the parties that the award is reached. There is a provision to this effect: 'That the schedule of *measurements* as made by Rounds & Hagler and A. H. McCarrell, and contained in their respective books, shall be produced and delivered to the board of arbitrators, and as far as said *measurements* coincide and agree, they shall be accepted as

correct; and whenever said measurements do not agree, then the board of arbitrators shall take *such* course as they may deem proper, to ascertain such measurements, as they need.' There is no provision in the submission as to the *acceptance* by the arbitrators of *any price* that may have been placed upon material or work by the contractors, or by McCarrell. Under this submission, the corporation appointed as their arbitrator, Joseph B. Storey, the plaintiffs appointed as theirs, Charles B. Allen, and those two appointed as the umpire, T. O. Brown; and on the 15th day of September, 1896, the three parties took an oath to carry out the terms of the submission. The evidence in the case shows that these three gentlemen are competent men, and stand well in the city of Augusta, where they live, and, in fact, in the argument of the case, counsel on both sides paid proper tribute to all of them. The two arbitrators, Storey and Allen, met, Mr. McCarrell appeared before them, as representing the company, and Mr. Rounds, the firm of Rounds & Hagler. It is unquestioned that a rule or regulation was agreed on, which was notified both to McCarrell and Rounds, that the arbitrators would meet every afternoon at the office of the Aiken Manufacturing Company, in Augusta, Ga., at 3 o'clock, and sit a reasonable time to consider the matters in question. This place was chosen without objection on the part of Mr. Rounds, and at the suggestion of Mr. Allen, because he said it was more commodious and suitable than his own private place of business. Both McCarrell and Rounds were present at many meetings. The arbitrators made calculations in the presence of both of them, questioned them, examined other witnesses, and went into all documents presented. Rounds made no objection either to the *place* of meeting, the *mode* of procedure, or the *fact* that McCarrell was present, or to the *fact* that sometimes he was called upon to do figuring for the arbitrators. These meetings continued through many days; Mr. Rounds testifies that he did not attend a good many of the meetings, for the reason that he had business elsewhere that called him, and he could not

attend; Mr. Allen testifies that quite frequently, after the
arbitrators had their afternoon sittings, he told Mr. Rounds
of what was going on, and of the decisions which had been
reached by the arbitrators.    It is established that the mode
of procedure adopted by arbitrators was this: that Rounds
presented a claim or estimate of his account which had been
previously prepared by Mr. Allen for him from his state-
ments; that McCarrell presented a paper, on the one side of
which was stated his claim or estimate of the company's ver-
sion of what was due, and on the other side his statement of
the Allen estimate.    The arbitrators compared the Allen
estimate with its revision by McCarrell, and found it correct,
and then proceeded to gather all the facts they could on the
various estimates, considering them item by item.    It seems
that none of the witnesses who were examined, and they
were very few, were sworn, nor did any person present ask
that they should be sworn.    The estimate of McCarrell's
claimed that the company was due to the builders $2,219.39,
but as the arbitration proceeded, it is shown that when he
made that estimate, he was not aware of the facts and figures
set forth in the bid of Rounds & Hagler, and the Barrett
memorandum, or that the ventilators put upon the mill were
not star ventilators, as required by the specifications, or of
the size required.    It appears that Storey and Allen differed
very little, and that whilst on the item of how many brick
Rounds & Hagler bid should be placed in the wheel house
and wheel pit, they differed, yet there was no contrary
decision by them; but Allen preferred that the umpire
should be called in to verify his work, as the umpire, Mr.
Brown, was very familiar with brick work.    He was called
in on this matter, and a few other minor matters which
took place then, will be considered hereafter.    On the 10th
of November, 1896, an award was made, signed by both
of the arbitrators and the umpire—all of them swear that
they signed the award.    It seems that Storey and Allen
signed together, and called in Mr. Brown at Allen's office,
and Brown signed in their presence.    This award gave

20—58

to the plaintiffs $1,002.86. This action is brought by the plaintiffs to set aside said award, and the allegations of the complaint will be considered seriatim, together with the facts applicable pro and con to each allegation. There is no allegation of actual fraud on the part of the arbitrators, nor is there any proof that shows any fraud. The specifications of error alleged in the complaint against the award, and upon which it is claimed the award should be set aside, and this matter which took forty-odd days to be settled by the arbitrators, should be sent to the Court for settlement, are set forth in the 7th paragraph of the complaint. The first specification of error is as follows: That the arbitrators exceeded the authority given them under the articles of submission, for they proceeded to readjust, assess and value the work done, and material furnished by the plaintiffs under the original contract, instead of confining their investigations, as they were bound to do under the agreement of submission, to extra material, and extra work furnished and performed in doing the additional extra work. This allegation should be considered along with what is alleged in the 5th paragraph of the complaint; that it was 'agreed to pay the plaintiffs for and at the same rate and proportion as similar work which the plaintiffs had agreed to do under the original contract'—that is, that the extra work was to be paid at the same rate and proportion as similar work under the original contract. The submission not only provides that the arbitrators should ascertain the price to be paid for such extra and additional work and material furnished, but that they should also ascertain 'the amount to be deducted for omission in the erection and building of the Aiken Manufacturing Company's mill, its canal and other structures.' The facts in the case go to show that a gross award was made. The process of procedure adopted by the arbitrators in reaching that result are set forth in what is called the O. K. paper in evidence, and that indicated clearly that in order to arrive at the price of the extra work and the omissions which were made in the original work, the arbitrators were obliged to

consider what was done in the original work, and what they did was simply to make from the evidence and facts before them, upon their best judgments, a statement of the accounts between the parties, setting forth, on one side in the beginning of the contract, price of the original work, $53,198, and following up that credit to Rounds & Hagler by credits of the value of work which they actually did, as found by calculations and measurements, and by placing on the opposite side of the account the charges which they considered proper against Rounds & Hagler, for omissions and deductions for omissions, which they should pay, and also the money which had been paid to them; and by this process being followed up to the end, they ascertained that the original work and the extra work were worth, according to the bids of the original work and the value of the extra work, based upon the value of the original work, $78,121.89, and that there had been paid to Rounds & Hagler, in cash and due by them to the company, for omissions and deductions, $77,119.03, leaving a balance due them of $1,002.86. If we deduct from $78,121.89, the whole amount estimated as the value of the original contract, and the extra work, the sum of $53,198, the contract price, it will be seen the arbitrators estimated the value of the extra work at $24,923.89. By paper K, put in evidence, dated November 4, 1896, it will be found that in reaching their conclusions of the value or price to be paid for laying of brick, Story and Allen decided 'that the proper and fair prices to be allowed Rounds & Hagler for extra brick work are as follows: $10 per M. for brick in Portland cement; $9 per M. for brick in Rosendale cement; $8 per M. for brick in lime.' The submission required them, that where the 'schedule of measurements' between the parties agreed, to take those schedules; but there is nothing in the submission that binds them to take the prices, nor is there anything in the contract fixing the prices. After hearing Rounds & Hagler and investigating their note book, as to what they claim that they bid for this work, and considering the fair price of such work, they decided as stated afore-

said.    Mr. Brown, when on the stand, testified that such figures fixed by the arbitrators, were fair, and the market prices.

"II.    The second specification of error in the award is that the umpire, having been called in to act with the arbitrators, it was necessary that the plaintiffs should have been notified of his sitting with the said board, and given an opportunity before the board thus composed, before it acted upon any matter submitted to it; but that no such notice or opportunity was given to the plaintiffs, and hence the award is null and void.    The facts on this specification are, that Mr. Allen says in so many words positively, that he notified Mr. Rounds of the meetings at which Mr. Brown was to appear as umpire.    Mr. Storey swears that at the meetings just previous to the night meeting in question, when Brown was present, and at which previous meeting Storey, Allen and McCarrell were present, it was agreed that Brown should be called in at that night meeting.    This, Rounds does not deny, or did not deny when on the stand.    He testifies, however, that he knew Brown was to be called in, and requested Allen to notify him of the meeting; why Allen should decline to have him present, is not explained.    Brown testifies that when he reached the meeting place, he asked if Rounds was to be present, and Allen said no, because he had told him that his claim would not stand.    Allen swears positively that he notified Rounds of the meetings for the umpire; from this testimony, considering the burden on the plaintiffs to show that there was no notice or opportunity given, it is clear, as a matter of fact, that Rounds had full notice that Brown was to be at that meeting, and of his own accord did not attend. He says that Allen told him of the result of the meeting the next morning, and yet he made no objection, or no request for a rehearing, and that decision of Brown, reached at the night meeting, was on October 16, 1896, and the award was never made until the 10th November, thereafter.    He was actually present at the subsequent meeting where Brown

acted; the only date of subsequent meeting given in the evidence, was October 30, 1896.

"III. The third specification of error is that the arbitrators having called in the umpire to act with them, the board thus composed could only hear any disputed matter by calling and swearing and examining witnesses before them; but that the said board, in disregard of the law and the plaintiff's rights, proceeded to settle such differences without swearing or examining any witnesses upon such differences, simply by each of the two arbitrators making his statement or report to the umpire, who then announced his conclusions, which the board adopted.   The facts which the testimony shows under this head are substantially these: that when Brown met with the arbitrators, he took no evidence from witnesses, by swearing the witnesses or by examining any witnesses, but that as the questions which he was called in merely to pass upon, were measurements of the plans and inspection of the books, he examined the plans and the books, and drew his conclusions from them, and from what the two arbitrators said of them as to their investigations.   On the question whether Rounds & Hagler, when they bid for the work on the wheel pit and the wheel house, bid on 928 M. brick, or 650 M., he decided in favor of the first number, after his own personal inspection of the book of Rounds & Hagler, and the figures thereon corresponding with the figures on the plans, and after making calculations thereon, he rendered his decision that night in writing.   If, as stated in the second head above, Rounds had actual notice, then he cannot complain; but even if he did not have actual notice of the meeting, still he says that on the next day Allen informed him of the decision.   That was many days before the final result was reached, and before that final result was reached, he went before the board again, with Brown present, and though he knew that Brown had not examined him, yet he did not demand that either he or other witnesses should be examined on that ground, and thereby he waived his right.

"IV. The fourth specification of error is that even if the

umpire had heard the cause and evidence upon the disputed issue, the award is null and void, for the reason that he did not join in the findings and executing the same with the two arbitrators. The facts on this head are that a tissue copy is produced by the plaintiffs, which they claim is the award, only signed by Storey and Allen. The defendant produced the written award, which is unquestionably signed by all three of the arbitrators, and the evidence shows that Allen and Storey signed it one night, in the presence of each other, and the next morning Brown signed it, in the presence of both Allen and Storey. The submission does not require any formal publication of the award. Mr. Winter swears that he, as the clerk of the defendant company, on the 14th of November, served a copy of the award on Mr. Rounds. Even if the tissue copy was the original award, it is signed by the two arbitrators, and if that is the conclusion of the two, it is binding.

"V. The fifth specification of error is that none of the witnesses were sworn. As a matter of fact, that is the case, but it is also a matter of fact, that none of the parties required that the witnesses should be sworn, and the law on the subject is stated elsewhere.

"VI. The sixth specification of error is: 'That through a *mistake* or *oversight* on the part of said arbitrators, the plaintiffs were charged with the value or upwards of 900 M. brick, as furnished to them by the defendants, and they were given no corresponding credit for using or laying the brick, and the work done by them, thus depriving the plaintiffs of a large sum of money that was justly due them.' At the hearing, Mr. Rounds reduced this item by his figuring to some 555 M., but it does not appear in the testimony that whatever was done about the brick, was done 'through a mistake or oversight on the part of said arbitrators.' It is admitted on both sides that the item of the brick in question was in discussion before the arbitrators many days, and that was the very item that the umpire was called on, and that whatever was done about these brick, was done, not by an

oversight or miscalculation, but after formal consideration. Further, page 3 of the O. K. statement shows that whilst on the one side charges are made against Rounds & Hagler for brick as upon the basis of work not done, though bid for, yet, on the other hand, they are given full credit for work actually done, both in original contract and the extra work.

"VII. The seventh specification of error is 'that by an oversight,' the plaintiffs were not allowed any compensation for extra painting done on the extra work. The facts here show by reference to item 7 of the O. K. paper, that claimants are allowed pay for wood work complete, and by reference to the yellow paper in evidence, and examination of the claim in Allen's statement, of item 7, painting was claimed, and in the McCarrell statement and estimate of the wood work complete, was claimed. This matter was considered, it seems, by the finding of the arbitrators, and decided as stated in item 7.

"VIII. The eighth specification of error is that the arbitrators failed to allow the plaintiffs payment for such extra work in the proportion that similar work was paid for under the original agreement. The facts show that there were no figures in the original agreement to show the price of any specific work, but that a gross sum was agreed on. Nothing fixed as to the price of laying brick in Portland or Rosendale cement, or lime, nothing fixed in the contract as to the price of wood work, or iron work, or anything else, except the price of $4.25 per M. for brick laid down at Bath. This being the case, and the arbitrators being called on to fix the price of extra work, they had to consider what they thought was the price of these species of work in the original contract, and taking into consideration all the facts and circumstances, they decided themselves, and that ought to be conclusive.

"IX. The ninth specification of error is that the arbitrators have deducted from the price of material furnished and for work done by the plaintiffs, coming under the original agreement, and have thereby wronged the plaintiffs. The facts in this case show that it was submitted, specifically and

distinctly, by the submission to the arbitrators to make all necessary deductions for omissions in materials not put in or work not done.

"X. The tenth specification of error is that the board irregularly, and contrary to law, suffered A. H. McCarrell to be constantly in attendance upon them, 'and that without giving the plaintiffs notice, or opportunity to be present, the said A. H. McCarrell was, in the absence of plaintiffs, questioned, and allowed to make certain statements,' etc., to the board, and that this conduct was enough to set aside the award. The facts show that McCarrell was present, as representing the company, and so was Mr. Rounds, as representing his firm; and the facts further show that Rounds knew McCarrell was present—was present with him; knew that McCarrell did figuring for the board, at their request, and that he did so when Rounds was present, and yet he never objected to the same. Mr. Hagler distinctly testified that he told Rounds that McCarrell ought not to be present, but yet Rounds testified that he never, at any time, objected to McCarrell being present or figuring for the board. All of the arbitrators say that they reached their conclusion, not from any figuring that McCarrell did, but from their own consideration and own work, and simply had McCarrell to write out their conclusions for them—such, for instance, as to multiply the amounts found by them by the prices fixed by them, and that afterwards they verified all of these statements for themselves.

"Mr. Storey says that though McCarrell wrote the award which was signed by the arbitrators, he wrote the original draft in pencil, and that is produced to the Court, and just here, it is very plain on the contention that was made, that the red figures which appear on the O. K. statement were put there after the conclusion was reached, that they must have been put there before, because the aggregate amount in red figures at the end of each column is stated in the black figures below in exactly the same amounts by which the conclusion reached was arrived at.

"The aforesaid condensed statement of facts are found by me to be the facts in this interesting case, as the basis of the conclusions to be reached herein.    Said facts are ascertained after a careful consideration of the pleadings, and the testimony, oral and documentary, presented to me in open Court. The witnesses having been sworn, and examined and cross-examined before me at the hearing at Aiken, during the winter term, 1899, and afterwards at a day agreed on between counsel, as the hearing could not be concluded at the regular term.    We will now consider the law which is applicable to the facts and circumstances surrounding the various transactions of this contest, as found by the Court.    Arbitrations ought to be encouraged by the Courts, and awards not set aside, unless some established principle of law has been violated, or some gross injustice done by the arbitrators, or where it is clearly established fraud has crept into the action of the arbitrators.    It is clearly laid down in the 1st Am. & Eng. Enc. of Law, page 706, that 'all reasonable presumptions will be made in their aid' (that is, in aid of awards).    'No intendment will be indulged to overturn them, but every reasonable intendment allowed to uphold them; to warrant a Court in reviewing an award upon its merits, something more than error in the decision must be shown.'    In our own case of *Cohen* v. *Hebenicht,* 14 Rich. Eq., page 49, Chancellor Inglis states the matter tersely as follows: 'Every controversy touching civil rights, necessarily involve questions both of law and of fact, and the ordinary tribunals are not so organized as to provide for determining each according to strict rules of right.    Arbitration is a method of settling their disputes which parties choose to substitute for the regular tribunals, by submission of matters in controversy, which does not clearly provide otherwise; arbitrators are, therefore, invested with at least as large powers of investigation and determination as are possessed by the tribunals which they supplant; but, more than this, the very purpose in transferring the controversy to such private forum, is that its fair adjustment may not be obstructed or trammeled by the tech-

nical rules of legal science; that consideration may be admitted as elements both in the matter and mode of composition which could not find access to the judgments of the regular Courts. The aim is, that substantial justice between the parties may be effected. To reach this result, uncertainties and doubts of law are to be solved by the arbitrators, and their conclusions herein become law of the parties *pro hac vice.* The rigor of extreme rules may be moderated by the requirements of fair dealing and good conscience. The written submission, signed by the parties having the controversy, gives to the arbitrators jurisdiction to determine the question in controversy and jurisdiction of the parties concerned, and much latitude is given to the arbitrators in their mode of procedure, the kind of notice they may give of the hearings, and the form in which the award may be made. It is unquestioned that if a hearing is had, entirely *ex parte,* by the arbitrators, without notice or opportunity to the other side to be present, that such an award should be set aside, as was done in the case relied on by plaintiff's counsel, decided by our Court of Appeals, and set forth in *Shinie* v. *Coil,* 1 McC. Chan., 475; but where the parties have notice of a hearing and opportunity to be heard, and are present and make no objection to the mode of procedure, they are deemed to waive all irregularities as to the procedure, and the award is valid and binding, unless assailable on the grounds of fraud, or in some cases of mistake, such as is relievable in equity.'

"With these general remarks applicable to the general aspect of the case, we will now proceed to consider the specific questions of law that arise. (*a*) It is claimed that the award is not valid, for that the same was reached by the arbitrators exceeding the authority given them by the submission. It is unquestioned that if arbitrators exceed the submission, the award may be avoided, but as found by me in this case, as a matter of fact, the arbitrators did not exceed the submission in this case, and acted fully within the submission, and I so find as a matter of law. This award, as

promulgated by the arbitrators, is contained on one sheet of paper, and awards a gross sum to be paid by the defendant to the plaintiffs; and whilst a great deal of testimony in the shape of documents was placed before the Court, as to the process by which the arbitrators reached that award, that final award is the document to be considered. It is stated by Mr. Morse, in his excellent work on Arbitration, page 165: 'that the process by which arbitrators came to an agreement is of no consequence, and cannot be inquired into by the Court, neither be made a basis to vacate their award.' This quotation seems to be based upon reason and good sense, but after careful examination of all the documents and proceedings, showing the process by which the arbitrators reached the award finally promulgated, I find nothing therein to invalidate the award. (b) As a matter of fact, it has been found that the plaintiffs had full notice of the various meetings held by the arbitrators, and full opportunity to attend; but beyond that, it is very clear as established law, that all irregularities as to the mode of procedure can be waived. See Morse on Arbitration, 116, 117, 118; Watson on Arbitration, star page 296. It is well settled that unless called upon so to do, it was not necessary to the validity of the award that the witness should be sworn (see Morse on Arbitration, page 131), and, in fact, it has been held by our own Court, in the case of the *State* v. *McCrosky*, 3 McC. Law, 308, that arbitrators have no power to swear witnesses, and that witnesses sworn before arbitrators could not be indicted for perjury, because the arbitrators had no power to administer the oath. In this case, though the plaintiffs knew that the witnesses examined were not being sworn, they proceeded with the arbitration, without asking that they should be sworn. (c) The award in this case was signed by all three of the arbitrators; the submission provided that 'the award of any two shall be final and binding upon the parties.' Mr. Brown, the umpire, was only called in to verify calculations, and it is insisted that he should have reheard the witnesses, and not made the conclusions without

rehearing the witnesses. The plaintiffs had notice and opportunity to appear before him, and did appear at one of the meetings before him; and the Court cannot perceive the violation of any principle of law by the conduct of the hearing after the umpire was called in. Our own Supreme Court, in the case of *Finney* v. *Miller,* I Bail. Law, 81, after careful consideration of the English authorities upon the subject, held distinctly, that where the arbitrators had disagreed upon the facts, the umpire could be called in, and that he could take the facts already found by the arbitrators, and consider the disputed questions, and decide them, and that the umpire need not hear all of the testimony anew, from the mouths of the witnesses, unless the parties require that he should do so. This case is followed in the case of *Sharpe* v. *Lipsey,* 2 Bail., 413, and the general principle upon which these adjudications are based are sustained by other respectable authorities, such as *Graham* v. *Graham,* 49 A. Dec., 559; Morse on Arbitration, 264; Watson on Awards, star page 296; Kid on Awards, 103; and the Court concludes as a matter of law, based upon the facts already found, that there was nothing in the conduct of the arbitration, either in omission or commission, after the umpire was brought in, that violates any principle of law, or would vitiate the award. (*d*) It is to be noticed that there is nothing in the submission, providing how the award shall be published or notified to the parties; and this being the case, it is settled law, that no particular form or kind of notice is required. Mr. Morse, in his work, already referred to, at page 285, says: 'Publication of an award is necessary only where the submission expressly stipulated that it shall be published or notified to the parties.' There is no question, from the facts already found, that the plaintiffs knew that the award had been made, and that a copy was delivered to them, and the Court sees no grounds to set aside the award, because of any non-delivery or non-publication thereof. It is satisfied that everything was done that it was necessary to do to bring the information contained in the award before the plaintiffs; and the 1st Am. &

Eng. Enc. Law, at page 704, states the doctrine as follows: 'It is impossible to give a stated rule by which to determine what is a sufficient publication; anything done which enables the parties to receive a knowledge of its contents, may be called a publication.' Certainly, the plaintiffs in this case received knowledge of the contents of this award. (*e*) It is next to be considered what is the law on the grounds of setting aside an award in a Court of Equity, on the grounds of mistake. It is very certain that there is quite a difference in the idea of 'mistake,' as a principle upon which awards can be vacated, and the idea of 'mere error of judgment' on the part of arbitrators. The doctrine seems to be well stated by the Supreme Court of the United States, in the case of *Burchell* v. *Marsh,* 17 How., star page 350, as follows: 'Courts should be careful to avoid a wrong use of the word mistake, and by making it synonymous with mere error, assume to themselves an arbitrary power over awards. The same results would follow if the Court should treat the arbitrators as guilty of corrupt partiality, merely because the award is not such a one as the Chancellor would have given. We are all too prone, perhaps, to impute either weakness of intellect or corrupt motives to those who differ with us in our opinion.' And to the same effect will be found our case of *Mitchell* v. *DeChamp,* 3 Rich. Eq., page 21. See, also, 2 Storey's Equity Jurisprudence, secs. 1453, 1454, 1455, 1456, and Pomeroy's Equity Jurisprudence, sec. 839; in not a single item brought before the Court, in the claim that the award is erroneous, is there the slightest resemblance to what is called mistake in equity. Every item which has been claimed to amount to a mistake relievable in equity, was considered and contested before the arbitrators, and passed on by them, and no matter how glaring there may be of errors in the results reached, unless such results are tantamount to fraud, yet they are the results of the Court of the choosing of the parties in this matter, and they are bound by them. This is applicable to the brick item, to the painting item, to the Lombard iron bill, and to the various other matters claimed

as mistakes committed by the arbitrators. It may be, that if I had been sitting upon the board of arbitrators, I may have allowed some of the items disallowed by the arbitrators; but if they, as they seem to have done, gave their honest judgments upon these matters, and considered all of these matters, as they seem to have done, carefully, and then to have arrived at a deliberate conclusion, I can see nothing in the evidence which would warrant me in the exercise of the equitable jurisdiction of the Court, to set aside this award on the ground of mistake. (*f*) Nor can the Court find any legal ground arising out of the alleged conduct of McCarrell, to vacate the award. It has already been shown, as matter of fact, that his attending on the meetings of the board of arbitrators had no effect upon their conclusions; that what he did was merely ministerial, and that each of the arbitrators, for himself, verified all calculations made by him before reaching their conclusion; besides this, Mr. Rounds knew that McCarrell was present from beginning to end, and though on one occasion Mr. Hagler told Rounds that he objected to McCarrell's being present, never once did Rounds raise that objection before the arbitrators; and now, after the result has been reached, it seems clear to the Court that any objection he could have made on that score is waived by the plaintiffs, with full knowledge of the facts before them, and it is so held. The case of *Small* v. *Trickey,* 66 Am. Dec., page 256, is a well considered case on this subject. The English doctrine is therein stated and sustained as follows: 'It was held in the House of Lords, in the case of *Drew* v. *Drew,* 33 Eng. L. & E., page 9, that where an arbitrator examined witnesses behind the back of one of the parties, such party is justified in at once abandoning the reference, and applying to a Judge to rescind the submission; but if he continue, after the fact came to his knowledge, to attend the subsequent proceedings, this will be a waiver of the irregularity, and he cannot afterwards set aside the award on that ground.' As a matter of law and fact, it is held that the award made between the parties in question, on

November 10, 1896, by J. B. Storey, Charles B. Allen and T. O. Brown, is valid and binding on the parties.    Wherefore, it is ordered, adjudged and decreed, that the said award be, and the same is hereby, confirmed, and that the complaint in this action be dismissed, with costs to be paid by the plaintiffs."

The plaintiffs have appealed from this decree, and set forth their objections thereto in twenty-four grounds.    I may remark, before setting out to give them a consideration, that I greatly regret that I cannot, in my view of what is due to the parties litigant, reproduce the testimony, as I would like to do, for it would require to do so several hundred pages. This testimony is both oral and documentary; the former is not so extended, but the latter is quite voluminous, including as it does the plans and specifications of the architects for the original cotton mill; the contract for executing the said plans and specifications; the book containing sundry calculations of Rounds & Hagler in reference to this contract to build the mill under the plans and specifications, which latter expressly provided for any additions or alterations of the original plan and specifications; testimony that certain alterations were made in the plan of the building, showing that where, under the original plan, a part of the building was to be one story in height, by the alteration of said plan all of the building was three stories in height; that a disagreement between the contractors and the owners of the mill led to an arbitration, which was duly provided for by an agreement in writing for such submission to two arbitrators, one to be chosen by Rounds & Hagler, and one by the Aiken Manufacturing Company, with the right to the two arbitrators to choose an umpire; that in the submission of this controversy it was expressly provided that Rounds & Hagler should present their schedules of measurement as contained in their books, and that A. H. McCarrell, for the Augusta Manufacturing Company, should present its schedule of measurement contained in its books, and that accordingly these schedules of measurements of each party were presented in writing ac-

companied by their books, respectively; that such schedules were entered in writing on the opposite sheets of what was known as the "yellow paper," wherein 144 items were set out; that the two arbitrators passed upon each one of these 144 items, and "allowed" or "disallowed" or "modified" the same; that two items were passed upon by Mr. Brown, an experienced and highly respected contractor for brick work, as the umpire, whose judgment was placed in writing, signed by himself; the settlement sheets of the arbitrators; the memorandum book of Rounds & Hagler; the memorandum made by Mr. Barrett for the mill; calculations by Mr. Estes for the mill; the original award signed by the two arbitrators and umpire, dated 10th November, 1896; copy thereof in tissue paper given by Mr. Allen to Rounds & Hagler on the night of 9th November, 1896; also copy of the original award served by Mr. Winter upon Rounds & Hagler on the 14th November, 1896. The foregoing list of papers are embodied in the "Case for Appeal," except that the plan and specifications for the cotton mill building, in all their many details, are not reproduced in this appeal, though enough is introduced in the "Case" to enable this Court to understand the issues. After the award, plaintiffs brought an action to annul it. I have spent days in my endeavor to understand the differences between these parties, as the differences are represented by the documentary evidence, together with the explanations thereof by the testimony of the witnesses on each side. And I shall now, as briefly as may be, respond to the questions raised by the grounds of appeal.

I will consider the first and nineteenth grounds of appeal together. Here the appellants claim that the arbitrators and umpire have, in their award, exceeded the power stipulated for their exercise in the articles of submission. Enough of the contents of this paper are embodied in the decree of Judge Benet to excuse me for not inserting the same at this point. The very terms of the plans and specifications of the architect for the building of

the Aiken cotton mill at Bath, S. C., required any changes in the plans of that building to be governed by the remuneration the builders, Rounds & Hagler, received for their work and material in building the original mill. In the contract of Rounds & Hagler the gross sum of $53,198 is contracted for by them in payment for all their work and the materials they should furnish in building the mill under their bid in writing. This being a sum in gross, how could any one determine what any particular piece of work or material in said mill building would cost? To determine the value of labor and material was only necessary in order to ascertain the value of similar labor or material in the alterations made outside of the original mill building. These exceptions are overruled.

I will next pass upon the 2d, the 3d, the 4th, the 15th, the 16th, the 17th and the 18th grounds of appeal, relating as they do to kindred subjects. These exceptions are as follows: "II. It is submitted that the award is null and void, because the umpire, having been called in to sit with the arbitrators to pass upon differences existing between them, he failed to have the plaintiffs before him at such hearing, or to give the plaintiffs notice of the time of such hearing, so that they might have had an opportunity to be heard, and his Honor, the Circuit Judge, erred in not so deciding. III. It is submitted that the award is null and void, because after the arbitrators had called in the umpire to sit with them to pass upon the number of brick estimated by the plaintiffs in their original bid, as was necessary for the wheel pit, which was in dispute between them, such matters could only be passed upon by calling and examining witnesses before the board as so composed, but that the board, in disregard of law and the plaintiffs' rights, allowed such disputed matters to be passed upon and decided by the umpire, upon each of the arbitrators making a report of their respective views to him, and his Honor, the Circuit Judge, erred in not so deciding. IV. Because the award was reached as the judgment of the umpire from statements made to him by the two arbitrators;

21—58

that the same was not signed by the umpire when declared and published; and for that reason is null and void, and the same could not be cured by the umpire subsequently signing the same, and his Honor, the Circuit Judge, erred in not so deciding. XV. Because his Honor, the Circuit Judge, erred in finding that the arbitrators and umpire signed the award on November 10, 1896, for it plainly appears from the evidence that the award was signed only by the arbitrators on that day, and not until after it had been announced and served on the plaintiffs, was it signed by the umpire. XVI. Because his Honor, the Circuit Judge, erred in finding as a matter of fact that Rounds had notice of the night meeting at which the umpire, Brown, was to attend, to pass on the number of brick estimated in the bid for the wheel pit; for it plainly appears by the testimony that Rounds had no notice of such meeting. XVII. Because his Honor, the Circuit Judge, erred in holding that because Rounds appeared before the umpire after he had rendered his decision concerning the number of brick estimated to be placed in the wheel pit, and did not then object to such finding of the umpire, or then demanded that he should be heard upon such question, he had thereby waived his right to be notified of such meeting. XVIII. Because his Honor, the Circuit Judge, erred in holding that the award is good if signed only by the two arbitrators, for it is submitted, while such is the rule when the arbitrators themselves agree, yet when the agreement is brought about by the decision of the umpire, as in this case, then the award is not valid, unless signed by the umpire."

(a) I agree with the Circuit Judge that the testimony of C. D. Allen is convincing that Rounds & Hagler were notified that Brown was the umpire, and that he would sit at the time he did with the arbitrators; but even if this was not so, Rounds was notified that night or the next morning, the 16th October, 1896, of the particular decision of Brown as umpire, and that he never communicated any objection to his finding, and that he afterwards was present with the arbitrators when Brown, the umpire,

was with them, at which time he made no request to be heard by himself or through his witnesses. It is admitted that, under the authority of the case of *Small* v. *Courteny & Smith,* 1 Brev., some notice of the umpire being present to hear and determine any of the issues included in the submission, should have extended to Rounds & Hagler. I am satisfied he received the notice of the hearing by the umpire, and that it was his own fault that he was not present. It is significant that his own arbitrator, Allen, who was afterwards his own witness, stated to Brown, the umpire, upon his inquiring as to where Mr. Rounds was, and if he would be present, that he would not, giving as his reason, Rounds' doubts of his case.

(b) Full testimony had been offered by Rounds & Hagler to the dispute as to 928,339 brick or the 650,000 brick. Their little book was in evidence. But the walls and their thickness were disclosed by the plans and specifications as well as a practical ocular demonstration. An allowance of twenty-one brick to the cubic foot was admitted. The two arbitrators and the umpire had all these things before them. The umpire said he could demonstrate by calculations that 928,339 brick were used and not 650,000. This last proposition of the umpire, while on the witness stand, was not controverted by the plaintiff, so far as requiring him to actually make the calculation, as he claimed he could. Experts generally know what they are swearing to in matters of this kind, such as the quantity of brick necessary in building walls of well determined dimensions. I agree with the Circuit Judge in this matter also.

(c) As to the fourth ground of appeal. The cases of *Finney* v. *Miller,* 1 Bailey, 81, and *Gibson* v. *Broadfoot,* 3 DeS., 584, are ample authority for the conclusion of the Circuit Judge on this point. (d) It was a question of fact as to what date the umpire actually signed the award. There was some testimony on the subject looking to an uncertainty as to whether the umpire signed on the same day as arbitrators—that is, some testimony that arbi-

trators signed on night of 9th November, 1896, and that umpire signed next day (10th November, 1896), in their presence. By special agreement in the submission, the finding of two of the board of arbitration was sufficient. Certainly two signed, even if the 9th is fixed, but all three on the 10th, if that was the date in November, 1896. What difference ought it to make if the umpire, Brown, only signed the award on the 10th November, and the other two on the 9th November. Had not Brown, the umpire, already in writing signed his name to the two findings he was called in to pass on? I desire my response at this point to be limited to the facts in proof in the case at bar; I would not desire any looseness in the signing of awards generally to be recognized by me. The Circuit Judge was right.

(e) As to the 16th ground of appeal, I have already indicated my opinion that Rounds, as a matter of fact, had notice of the night meeting at which the umpire, Brown, was to pass on the question of 928,000 brick or 650,000. I sustain the Circuit Judge.

(f) I conceive that this, the 18th ground of appeal, is not well taken, for the reasons set out in (d), and it is overruled.

I will next pass on the 5th ground of appeal, which is as follows: "V. Because it appeared from the evidence that the testimony of all the witnesses was taken without having them sworn, and for that reason the award is rendered null and void, and it was error in his Honor, the Circuit Judge, in not so deciding." This submission to arbitration is under no statute of this State nor under any order of Court. It is a submission under the common law. In the 2d vol. A. & E. Enc. of Law (2d ed.), at page 659, it is stated: "At the common law, an arbitrator has no power to administer an oath to the witnesses who are brought before him. But the administration of an oath by him without legal authority does not invalidate the proceedings." This is no longer an open question in this State. *State* v. *McCroskey,* 3 McCord., 308, which goes to the full

length to which the Encyclopoedia just above quoted goes. This ground of appeal is overruled.

I will next consider in one group the 6th, 7th and 8th grounds of appeal. "VI. Because it appears from the evidence that, through a mistake and oversight, the plaintiffs were charged with 928,339 brick as being their estimate, as contained in their original bid for building the wheel pit, whereas, it appears by the weight of evidence, the plaintiff's estimate for doing such work was only 650,000 brick, and the plaintiffs have thereby been deprived of $2,783.39 in money on that account alone, and the Circuit Judge erred in not so deciding. VII. Because it appears by the evidence that, by mistake or oversight, the plaintiffs were not allowed any compensation for the painting on extra work, and the Circuit Judge erred in not so deciding. VIII. Because it appears from the evidence that the plaintiffs furnished iron for the extra work to the amount of $547.43, and by mistake or oversight on the part of the arbitrators, were only credited with $390. That such iron was worth $547.43, at the rate such work was charged for in the original contract. And it further appears that no amount whatever was allowed the plaintiffs as compensation for placing and putting up such extra iron work, and that the plaintiffs thereby have been unjustly deprived of a considerable sum of money, and his Honor, the Circuit Judge, erred in not so deciding."

(a) I have already announced my full concurrence with the finding of the Circuit Judge on this subject. It has always seemed to me that when three practical, honest-minded brick experts join in an agreement of this character, it is entitled to great weight. The 6th exception is overruled. (b) The *witnesses who* were arbitrators testified that they allowed for the painting by taking the wood and iron work *when painted,* thereby affording full compensation for the painting as an item. This exception is overruled. (e) So far as the Lombard Iron Company's account, which the plaintiffs, appellants, claimed they have paid, it may be remarked that this account in its

entirety was certainly before the arbitrators. The plaintiffs claimed $547.43, the defendant, respondent, claimed that only $260 was due. After hearing all sides, an award for $390 was made to Rounds & Hagler. In the 2d vol. of A. & E. Ency. of Law, at page 661, it is said: "In the United States, the arbitrator is not bound by the strict rules of law as to the admission or rejection of testimony. He may receive the evidence of witnesses who are legally incompetent, if he thinks proper." That great liberality is allowed arbitrators when their findings of law and fact are canvassed in this State: See *Mulder* v. *Cravat*, 2 Bay, 370; *Mitchell* v. *DeSchamps*, 13 Rich. Eq., 9. This exception is overruled.

I will next consider the 9th ground, which is as follows: "IX. Because it appears from the evidence that the plaintiffs had paid $35 a piece for the three ventilators placed as called for by the original contract, and that they had paid the same price for the ventilators used in the extra work; that under the terms of the contract they were entitled to be paid for the extra ventilators at the price of the ventilators used under the original contract, but that the arbitrators, without right, reduced the price of the ventilators put up under the original contract to $10 a piece, and they also, without right, fixed the price of the extra ventilators at the same price, and his Honor, the Circuit Judge, erred in not so finding." In the original contract, Rounds & Hagler had contracted to furnish "star ventilators." Instead of these, they furnished a cheap imitation of the star ventilators— only thirty inches in diameter, while the star ventilators were thirty-six inches in diameter. Rounds & Hagler wanted to charge $35 each for the ventilators furnished by them, when their own witnesses said $10 was a fair price. Under the submission, it was agreed that the arbitrators should pass upon any omission by Rounds & Hagler. This was such a palpable omission, that the award contained only an allowance for $10 each to these ventilators. This exception is overruled.

I will next consider the 10th ground of appeal, which is as follows: "X. Because it appears from the evidence that the plaintiffs were allowed for building the wheel pit and tail race a credit of $5,190.20, and charged back for the same items, $10,025.39, thus wrongfully causing a loss to the plaintiffs on this item of $4,834.99; whereas, the work not being omitted, the plaintiffs should have only been charged back the amount which they were credited for the same. In fact, such items were not extra work at all, and should not have been taken in account by the arbitrators, and the Circuit Judge erred in not so deciding." The "wheel pit and tail race" in this controversy have certainly occupied an important position. In respondents' argument in answer to this exception, they say: "It will be seen by reading this exception that the counsel who prepared it based his allegation of error upon the idea that the work out of which these charges arose was not 'omitted' work. That statement in the exception that it was not 'omitted' work is a most violent presumption; for the fact is, as we will submit under the testimony, that that is exactly the category in which it is, and that the arbitrators so found, and properly found. Let us look to the yellow paper (f. 624). We will find there in italics the decision of the arbitrators: 'It is decided that Rounds & Hagler estimated 928,339 brick in Portland cement; that the company paid them $742 for the tail race walls; and further decided, 'wheel house and tail race wall as built, 24,715 1-4 cubic feet, at twenty-one per foot, equaled 569,020 brick in Portland cement.' That was their decision. What does it mean? That in the contract price for the lump sum of $53,198, Rounds & Hagler undertook to put in the wheel house and its appurtenances, 928,339, and that in accordance with the figures set forth in the Barret memorandum and bid (f. 550 to f. 552), included in that $53,198 was $742 for the tail race walls. Let the Court, if they wish any explanation of that matter, and of the figures contained therein, look to the explanation of Mr. Estes, on p. 185 of the brief and his testimony (f. 253). The arbitra-

tors then decided that Rounds & Hagler, for the pay which they received in that lump sum, *contracted to put* in 928,339 brick in the wheel house and wheel pit, and to build the tail race walls for $742; but the arbitrators decided, as will be seen by the other part of the decision, that the value of what was done, namely, "The wheel house and tail race wall *as built,* 24,715 1-4 cubic feet, at twenty-one per foot, equals 519,020 brick in Portland cement,' was less than the amount of brick work which they contracted to do, and hence the difference which they did not do was 'omitted' work to be paid for at the price of 'omitted' work. Now let us look at the O. K. statement (f. 450), and see the price at which they stated this 'omitted' work. They gave Rounds & Hagler credit for what they thus express it: 'The wheel house and tail race wall *as built,* 24,715 1-4 cubic feet, at twenty-one per foot, equals 519,020 brick in Portland cement, at $10, equals $5,190.20. That is, they gave him credit for the wheel house and tail race wall as built.' Now, then, there was more work—more brick—which they should have put in those same structures, and hence they charged against them the total which they had contracted to build, and the difference between which they did build and what they had contracted to build was 'omitted' work, which must be charged against them. What, now, do they charge against Rounds & Hagler (f. 451)? 'It is decided that Rounds & Hagler based their bid on 928,339 brick in Portland cement, at $10, equals $9,283.39. Also that for tail race, as per original plan, Messrs. Rounds & Hagler charged the company $742—$10,025.39. Hence, if we deduct from $10,025.39, which is the value of the work they contracted to do, and for which they were paid in $53,198, the lump price for the contract, the amount, $5,190.20, which is the price of the wheel house and tail race wall as built, there will be left the sum of $4,825.19 (not $4,834.99), as the price of the 'omitted' work, which, under the submission heretofore called to the attention of the Court, the arbitrators had a right to require that Rounds & Hagler should pay. In this

connection we desire to submit to the Court the following figures, to show that in item 30, the amount, $9,283.39, charged by the arbitrators, charged against Rounds & Hagler, is not excessive or too much. If the Court will look at the bid and Barrett memorandum, it will find that the following figures are correct: They bid for foundation work, $7,500; for wheel house, $8,472—$15,972. They were allowed per Barrett memorandum, $17,166; excess allowance, $1,128. Add to this the amount of actual bid for wheel house, etc., $8,472—total which contract called for, $9,600. But arbitrators only charged them with $9,283.39. Difference in their favor, $316.61."

From the views thus presented, it would seem that the Circuit Judge had committed no error as here pointed out, and the exception is overruled.

I will next notice the 11th, 12th, 13th and 14th grounds of appeal: "XI. Because it appears from the evidence that the plaintiffs' bid upon the original work was upon the basis of the following prices for brick, namely: Brick laid in lime mortar, per thousand, $9; brick laid in Rosendale cement, per thousand, $10; brick laid in Portland cement, per thousand, $11.50. And the arbitrators were, therefore, bound to allow the plaintiffs the same prices for laying the brick in the extra work; and they also erred in fixing prices of the brick laid in mortar at $8 per thousand; laid in Rosendale cement at $9 per thousand, and laid in Portland cement at $10 per thousand; for such finding was arbitrary, and without any evidence to support the same, and the Circuit Judge erred in not so finding. XII. Because it appears from the evidence that the defendants did not object to, but had themselves allowed $8.75 per thousand for brick laid in lime mortar and $9.50 per thousand for brick laid in Rosendale cement, and, therefore, the arbitrators had no authority to reduce said amounts, and it was error in the Circuit Judge in not so deciding. XIII. Because it appears from the evidence that the arbitrators have assessed the entire brick work in the defendant's mill as valued at $8 per thousand for brick laid in lime mortar, $9

per thousand for brick laid in Rosendale cement, and $10 per thousand for brick laid in Portland cement, instead of at $9, $10 and $11.50, respectively, and have thereby unjustly, and without right, caused the plaintiffs a loss of $1 to $1.50 on every thousand of brick laid in said mill. XIV. Because it appears from the evidence, while the arbitrators have allowed the plaintiffs the price of $10 per thousand for brick laid in Portland cement, they have in several instances, as appears upon the O. K. account, charged the plaintiffs $10.75 per thousand for brick omitted to be laid in Portland cement—thus showing that the arbitrators, either through mistake or partiality, deprived the plaintiffs of a considerable sum of money, and his Honor, the Circuit Judge, erred in not so deciding."

(a) It was in a lump sum that Rounds & Hagler made their bid $53,198. They now contend that such bid was upon the basis set out in the exception. This is a part of their testimony; and as I remarked a short while ago, under the decisions in this State, great latitude is allowed arbitrators in reaching their conclusions. There was nothing in the submission which would compel them to adopt Rounds & Hagler's views. They did adopt their views in a vast majority of the 144 items considered by them. In some instances the arbitrators and the umpire declined to accept their suggestions. I cannot say they were in error. The matter was confided to them by Rounds & Hagler; now that they have lost, they must bear themselves with equanimity. This exception is overruled.

(b) The arbitrators were not bound to accept the suggestions of the Aiken Manufacturing Company; the truth is, they knew more about these matters than did the defendant, respondent. This exception is overruled.

(c) As to the 13th exception, I may say that it was perfectly competent, under the terms of this submission, to ascertain what similar work under the original contract was worth, so as to apply such values to the same kinds of work, under the alterations and addi-

tions which were made in the mill building. This exception is overruled.

(d) The facts do not bear out the allegations made in the 14th exception, and it is overruled.

I will next consider ground of appeal 14 1-2, which is as follows: "XIV 1-2. Because the Circuit Judge found, as matter of fact, 'that whilst on the item of how many brick Rounds & Hagler's bid should be placed in the wheel house and wheel pit, they differed, yet there was no contrary decisions by them; but Allen preferred that the umpire should be called in to verify his word, as the umpire, Mr. Brown, was very familiar with brick work.' In such finding, his Honor erred, for it plainly appears from the evidence that the umpire, Brown, was not called in to verify Allen's work, but to the contrary, to decide the difference between the arbitrators concerning the number of brick which should be charged against the plaintiff for such work." I do not consider that the phraseology of the Circuit Judge was quite as happy in this connection as it usually is, but nevertheless it is patent that he is referring to the fact that the arbitrators did unite in calling in Mr. Brown as umpire, and that it was primarily at the request of Mr. Allen. This exception is overruled.

I will now pass upon the 20th and 21st grounds of appeal. "XX. Because it appears from the evidence that A. H. McCarrell, the representative of the defendant, was in constant attendance upon the arbitrators; that he sat with them at every meeting of the board in the absence of the plaintiffs as well as when they were present; that he was constantly called by the arbitrators to do their calculations and ever present in their consultations, and when they were deciding differences between the parties, and was really the clerk of the board. It is admitted that it is improper that the triers of issues between contending parties should be so attended by one of the parties in the absence of the other; that his influence in making calculations for the board tends to bias their judgment to the prejudice of the other party, and in this

case did so influence the board of arbitrators, and under such circumstances the said McCarrell so sitting with the board of arbitrators was improper and rendered the award null and void, and it was error in the Circuit Judge in not so deciding. XXI. Because it appears that the red lettering and figures on the O. K. statement was placed there by McCarrell after the said statement had been signed by the arbitrators, and that the same was the work of said McCarrell and not of the arbitrators, and it was error in the Circuit Judge in not so deciding."

I cannot regard Mr. McCarrell's presence with the arbitrators as any ground for setting the award aside. Mr. Rounds was invited to be present—he was for a week or ten days; then his other business called him away to attend to it. Mr. McCarrell was admittedly the employee or agent of the Aiken Manufacturing Company. His presence with the board was stipulated for in the submission for at least a part of the time. No harm has been pointed out as the result of his presence before the board. It must always be remembered that he was the representative of a deaf and dumb creature—a corporation—an artificial person. This exception is overruled.

I do not admit that the allegations of fact set up in the 21st exception are well grounded. Everything was regular—the findings were those of arbitrators. Let this exception be overruled.

I will next consider the 22d, 23d and 24th exceptions. "XXII. The Circuit Judge holds: 'Every item which has been claimed to amount to a mistake relievable in equity was considered and contested before the board of arbitrators, and passed on by them, and no matter how glaring there may be error in the result reached, unless such are tantamount to fraud, yet they are the result of the court of the choosing of the parties in this matter, and they are bound by them in such finding and conclusion. It is submitted that the Circuit Judge erred, for a glaring gross mistake in the findings of a board of arbitrators is not above the law, but is subject to

the jurisdiction of equity, to the end that justice may be done.    XXIII. It appears from the evidence, that the defendants themselves stated the account between themselves and plaintiffs by which they admitted an indebtedness of $2,219.39, and to that extent there was no dispute on the part of the defendant of the plaintiffs' account, and it was, therefore, error in the board going behind such admissions, and reducing the defendant's liability to an amount less than what they admitted, and it was error in the Circuit Judge in not so deciding.    XXIV. It is admitted that no such question as what might be due by the plaintiffs to the defendant, on account of wood or lumber by A. J. Twiggs, was submitted to the arbitrators, and they had no authority or right in making any award concerning the same, and the Circuit Judge erred in not so deciding."

(a) The Circuit Judge did not intend to assert that no glaring or gross mistake in the findings of a board of arbitrators is above the law—that is, beyond the jurisdiction of a Court of Equity to relieve against.    His Honor, the Circuit Judge, had before him the case of *Aiken* v. *Bolan,* 1 Brevard, 239, where the Court said: "The Court (all the Judges present except Grimke) said all awards are entitled to great favor and indulgence, and ought not to be too rigidly examined and construed.    That it was a mode of deciding controversies which ought not to be discouraged; and, therefore, the Courts had never set aside awards except for misbehavior of arbitrators as on account of gross partiality, collusion or fraud, or else on account of some mistake which arbitrators sometimes may fall into without design, by which their award is made to operate in a way they did not intend, or for some mistake apparent on the face of the award."    What he meant to express was the spirit of *Aiken* v. *Bolan, supra.*    He was not in error.    The Circuit Judge had before him the case of *Mulder* v. *Cravat,* 2 Bay, 372.

(b) If the arbitrators were clothed, as they were, under the submission, to do substantial justice to the plaintiff and defendant in regard to the transaction involved in the labor

and material furnished by the appellants to the respondent in the construction of cotton mill and its ways, and amongst these transactions the board of arbitrators found that the respondent, under a mistake of fact, had been willing to concede to the appellants more than they were entitled to receive, it was in the power of said board to adjust these matters as required by truth, right and justice. See, also, *Cohen* v. *Habenicht,* 14 Rich. Eq., 31. This exception is overruled.

(c) Lastly, as to the 24th exception, where the appellants suggest that the four cords of wood belonging to the Aiken Manufacturing Company, and which were given by the appellants to one Mr. Twiggs, and which four cords of wood were valued at $10, were not included in the submission, and, therefore, the board of arbitrators were in error in considering and disposing of the same.

First. I may say, if this had been an error, it would not have invalidated the award, except to the $10 itself. *Mitchell* v. *DeChamps,* 13 Rich. Eq., 23 and 24, *where the Court sustained the award;* but as $426.50, in Confederate money, had not been included in the award, the Court referred it to the commissioner to ascertain and report its value. Second. I remark that it was no mistake in the board of arbitrators to include it. This four cords of wood was part of the material paid for by the respondent to the appellants as material in constructing the mill house. Having been paid for by the respondent, the appellant had no right to dispose of it. Having done so, they should respond to the respondent for the $10, its value. This ground of appeal is dismissed.

It is the judgment of this Court, that the judgment of the Circuit Court be affirmed.