STATE *EX REL.* ABBEVILLE COUNTY v. McMILLAN.

1. MANDAMUS—CONSTITUTION—GREENWOOD COUNTY.—Commissioners appointed by the governor, under the Constitution and the act creating the county of Greenwood, to apportion the *bona fide* indebtedness of Abbeville County between it and Greenwood, have no such plain ministerial duty imposed upon them as to *how* they shall divide the indebtedness, as can be enforced by mandamus.

2. PUBLIC COMMISSION—PUBLIC DUTY.—The act of the majority of a number of persons appointed by law to perform some public duty is the act of the whole.

3. PUBLIC DUTY—OFFICER—MANDAMUS.—Whether an officer has erred in the performance of a public duty in which he has discretion, cannot be inquired into under proceedings in mandamus.

Petition in the original jurisdiction of this Court by Abbeville County for mandamus *v.* J. L. McMillan, J. B. Hal-

tiwanger, and T. A. Graham, as commissioners to apportion the indebtedness of Abbeville, Edgefield, and Greenwood Counties.

*Messrs. Graydon & Graydon*, for petitioner.

*Messrs. McGowan & Green*, contra.

The following are the findings of fact by R. W. Shand, Esq., special referee:

1. Prior to June 4, 1897, the county of Abbeville was subdivided into sixteen townships, including the townships of Greenwood, Ninety-Six, White Hall, Long Cane, Cokesbury, Smithville, Cedar Springs, and Indian Hill.

2. Not later than September, 1896, it was generally believed by the people of Abbeville County that a portion of that county, including the town of Greenwood, would be formed into a new and separate county. The survey of this proposed new county was made in September or October of that year, the necessary election was held shortly afterwards, and the new county was authorized by an act of the legislature, approved March 2, 1897, and went into full operation on June 4, 1897. That the said new county of Greenwood has taken from the old county of Abbeville all of Greenwood, Ninety-Six, and White Hall Townships, and portions of Long Cane, Smithville, Cokesbury, Cedar Springs, and Indian Hill Townships.

3. That at a meeting of the board of county commissioners for Abbeville County, held October 5, 1896, all of the townships being represented, except White Hall, it was unanimously resolved that the supervisor of Abbeville County be authorized to purchase four road machines and mules to operate them. No recorded action of that meeting designates the portions of the county in which these road machines and mules were to be worked, but none of the commissioners understood that they were to be purchased for the use of only that portion which would lie outside of the proposed county of Greenwood, and several

commissioners from the townships which expected to be included in the new county understood, from discussions amongst the members, that every portion of the old county would have its proper portion for their exclusive use and under their exclusive control; and without such understanding, these members would not have voted for the purchase.    But no resolution was offered and passed so declaring.

4. At this October meeting of the board, and also at the November and December meetings, there were discussions amongst some of the members as to the proper distribution of these machines and mules, but no formal action was taken until the meeting of January 7, 1897, when (excluding the township of Abbeville, which was to be worked by the chain-gang, under the supervision of the supervisor,) the townships were divided into five groups of three each; the second group being Cokesbury, Long Cane, and Smithville; the third group, Indian Hill, Bordeaux, and Cedar Springs; and the fourth group, Greenwood, Ninety-Six, and White Hall.    Each group was to be allowed one road machine, and the three commissioners of each group were to select the working force, to wit: a superintendent, at a salary of $30 per month; a driver, at $10 per month; and an extra hand, at $10 per month.

5. In pursuance of the resolution passed at the October meeting, the supervisor of Abbeville County purchased a number of mules, four road scrapers, and the necessary harness, in February, 1897, at the aggregate price of $3,504.50, paying to the venders $2,931.17 in cash at the time of the purchase and in the May following, leaving the county of Abbeville still indebted to the vendors in the sum of $573.33, which was still unpaid on June 4, 1897.    This purchase was marked paid on the books of the county treasurer of Abbeville County, prior to June 4, 1897, to the extent of $2,931.17.    These expenditures were approved by the board of county commissioners at their meeting in April, 1897.

6. It is stated in the testimony that this $3,504.50 was

an unpaid debt of Abbeville County on June 4, 1897. It cannot be included in any item of the debt statement of that date except the item of "Unpaid indebtedness of 1897, $5,587.51;" but as it may be included in that item as money borrowed to make the payments of $2,931.17 to the vendors of these articles, the referee finds as a fact that it was so included.

7. None of the mules, scrapers, and harness purchased in February, 1897, were ever used during that year, either before or after June 4th of that year, in that portion of Abbeville County which is now within the boundaries of Greenwood County, and the latter county has never received any benefit whatsoever from said purchase.

8. The group of townships embracing Greenwood, Ninety-Six, and White Hall never had any of the scrapers or mules within her limits in the year 1897. All of the other four groups received a scraper, with the necessary number of mules, in April, and retained them until late in the fall, when they were returned to Supervisor Lyon, of Abbeville County, who has since had them in charge.

9. The mules and scrapers sent to the two groups which were divided by the new county line worked the roads only in the portion of these townships retained in the old county, turning back when they reached the Greenwood County line. All this was done by direction of Mr. Lyon, the supervisor of Abbeville, both before and after the new county was fully established by law on June 4, 1897.

10. The township commissioners of Greenwood, Ninety-Six, and White Hall never elected a superintendent to work the scraper and mules for their group, but two of them, in the absence of the third, designated Mr. C. A. C. Waller, the commissioner for Greenwood Township, to receive the scraper and mules for their group; and in May Mr. Waller asked Supervisor Lyon for them, but he failed to get them. After the supervisor of Greenwood County had qualified, he made demand of Supervisor Lyon for Greenwood's share of this property, but the demand was refused.

11. The expense of working these roads with these mules and scrapers was paid out of the commutation tax collected from the territory in which worked. No part of the commutation tax collected from the territory now within Greenwood County was expended on the roads which are within the present county of Abbeville, but was paid over in full to the supervisor of Greenwood County after June 4th.

12. J. L. McMillan, of Abbeville County, J. B. Halti-wanger, of Edgefield County, and T. A. Graham, of Greenwood County, were appointed a commission to apportion between Edgefield and Greenwood Counties and between Abbeville and Greenwood Counties the proportion of the lawful *bona fide* indebtedness of the old counties of Edgefield and Abbeville, respectively. This commission met at Greenwood, S. C., on October 19, 1897, and organized by selecting J. B. Haltiwanger chairman of the board.

13. Said commission unanimously agreed that the apportionment of indebtedness should be made on the basis of the taxable property in the territory retained in the old counties of Edgefield and Abbeville and in the territory embraced in the new county which was taken from these two. And they further unanimously agreed that the taxable property of old Edgefield County and old Abbeville County, and the proportion of the indebtedness of these two old counties chargeable to Greenwood County, and the lawful debt of old Edgefield County, were as stated in the report, a true copy of which is set forth in paragraph 2 of the return of respondents.

14. J. B. Haltiwanger and T. A. Graham further agreed that the lawful indebtedness of old Abbeville County was $27,163.93, but the sum of $3,488.50 indebtedness for the purchase of mules, scrapers, and harness (then erroneously charging $125 for the harness, instead of $141.50, as was correct,) in February, 1897, was not a proper item of indebtedness of Abbeville County to be considered by them in apportioning the indebtedness of old Abbeville County between Abbeville and Greenwood, and, therefore, this sum

of $3,488.50 was not included in the aggregate indebtedness of old Abbeville County as agreed to by Messrs. Haltiwanger and Graham.    To this conclusion, J. L. McMillan did not assent, he contending that the true debt of Abbeville County on June 4, 1897, was $30,548.93.

15. J. L. McMillan left for his home in Abbeville after the matters stated in the three preceding findings had been fully settled and determined upon, saying that he might sign the report after consulting "his people" at home, and Messrs. Haltiwanger and Graham understood him to mean that he might then assent to the full report; but it having been suggested at this meeting, by some one present, that Mr. McMillan might sign the report, expressing his dissent as to the amount of the indebtedness of Abbeville, it was only such a signing that he had in mind when he made this statement.

16. On that same day, after Mr. McMillan's departure, Messrs. Haltiwanger and Graham wrote out and signed in triplicate the report, as copied into paragraph 2 of the return, which exactly embodied the conclusions fully determined by the board and understood by the three members, before Mr. McMillan's departure.    Mr. Haltiwanger took one copy with him to Edgefield and Mr. Graham retained two.

17. Awaiting further information from. Mr. McMillan, and then from a doubt as to whom their report should be made, the delivery of their report was delayed by Messrs. Haltiwanger and Graham until after the petition for mandamus in this case was served upon them, when Mr. Haltiwanger sent his copy to his Excellency, Governor Ellerbe, in whose office it was filed November 30, 1897.

18. The statement of the indebtedness of Abbeville County in this report is an aggregate of the items set forth in the statement contained in paragraph 2 of the return of respondents, and it was admitted at the reference that the item of "Interest, $875," was an error inadvertently entered.

March 24, 1898. The opinion of the Court was delivered by

MR. CHIEF JUSTICE McIVER.    This petition addressed
to this Court, in the exercise of its original jurisdiction,
prayed for a writ of mandamus requiring the commissioners
named in the title to apportion the indebtedness of Abbe-
ville County between the counties of Abbeville and Green-
wood, as required by the act establishing said last mentioned
county.    An alternative writ of mandamus was issued by the
order of this Court, requiring said commissioners to make
such apportionment, or to show cause why they should not
be compelled to do so.    To this alternative writ the re-
spondents, Haltiwanger and Graham, made a return, setting
forth various reasons why a peremptory writ of mandamus
should not issue.    The relator traversed this return, thereby
raising issues of fact, and, in accordance with the practice
of this Court, an order was passed, referring it "to R. W.
Shand, Esq., as special referee, to hear and determine all
issues of fact raised by the pleadings, and report the same
to this Court."    In accordance with this order the referee
has made his report, which, with the testimony taken by
him, was filed in this Court on the 4th of January, 1898.

The other respondent, McMillan, does not seem to have
made any formal return to the alternative writ of man-
damus, but we find his affidavit attached to said alternative
writ, in which, amongst other things, he says: "That de-
ponent is perfectly willing to join with the other two mem-
beis of the commission in dividing and apportioning said
debts whenever they will agree to make said apportionment
according to law"—and this we suppose was intended for,
and may be regarded as, his return to the writ. . Art. VII.,
sec. 6, of the present Constitution, declares that "all new
counties hereafter formed shall bear a just apportionment
of the valid indebtedness of the old county or counties from
which they have been formed;" and sec. 16 of the act to
establish the county of Greenwood, approved 2d of March,
1897, 22 Stat., at page 612, provides as follows: "That the
governor is authorized and empowered to appoint a com-

mission of three persons, one of whom shall be a resident of Abbeville County, and one a resident of Edgefield County, and one a resident of the new county of Greenwood, which said commission shall divide and apportion between the counties of Edgefield and Greenwood, the lawful ·and *bona fide* indebtedness of the old county of Edgefield, and also apportion and divide between the counties of Abbeville and Greenwood, the lawful *bona fide* indebtedness of the old county of Abbeville, existing at the time Greenwood County goes into full operation, having due regard to the amount of unpaid taxes due in each of said counties; and that said county of Greenwood shall receive credit for its proportionate share of any money on hand in each of said counties not heretofore expended; and said commissioners shall receive from the county of Greenwood, each, two dollars per day for not exceeding ten days." In pursuance of this act, the persons named as respondents in the title of this case, to wit: J. L. McMillan, of Abbeville County, J. B. Haltiwanger, of Edgefield County, and T. A. Graham, of Greenwood County, were duly appointed by his excellency,. the governor, on the 19th of June, 1897, as members of the commission required by the act, to apportion the indebtedness of the several counties named—the county of Greenwood having gone into operation on the 4th of June, 1897. On the 19th of October, 1897, the full commission met at Greenwood and organized by appointing J. B. Haltiwanger as chairman, and proceeded to perform the duties assigned. The commission unanimously agreed "that the apportionment of the indebtedness should be made on the basis of the taxable property in the territory retained in the old counties of Edgefield and Abbeville, and the territory embraced in the new county which was taken from these two. And they further unanimously agreed that the taxable property of old Edgefield County and old Abbeville County, and the proportion of the indebtedness of these two old counties chargable to Greenwood County, and the lawful debt of old Edgefield County were as stated in the report, a

true copy of which is set forth in paragraph 2 of the return of respondents." But as to the lawful indebtedness of old Abbeville County the commissioners did not agree, two of the commissioners, Haltiwanger and Graham, finding such indebtedness to be the sum of $27,163.93, while the other commissioner, McMillan, contended that the correct amount was $30,548.93, the difference arising from a controversy as to whether the purchase money, amounting to $3,488.50, of certain road machines, mules, and harness, should be included in the indebtedness of old Abbeville County on the 4th of June, 1897, when the new county of Greenwood went into operation. The referee makes various findings of fact bearing upon this controversy, which, under the view we take of the case, need not be specifically stated here, though the full report of the referee should be embodied in the report of this case. At the meeting of the commission above referred to, the two commissioners, Haltiwanger and Graham, made and signed a report, addressed to the governor, a copy of which is set forth in the second paragraph of the return of these two respondents, in which the indebtedness of Abbeville County, on the 4th of June, 1897, is set down at the amount for which they contended, to wit: the sum of $27,163.93. That report was not signed by the other commissioner, McMillan; but when he left he stated that he might sign the report after consulting "his people," by which, as the referee finds, the other two commissioners understood him to mean that he might assent to the report as made—though what he really meant was, that he might sign, expressing his dissent as to the amount therein stated as the indebtedness of Abbeville County. Matters remained in this condition for some time, and until one of the commissioners, Graham, was informed by a letter from the attorney of McMillan that he would not sign the report. Thereupon the said report of the majority of the commissioners was forwarded to the governor, and filed in his office on the 30th of November, 1897, a few days after the alternative writ of mandamus was served upon respondents.

The question presented for our determination, upon the pleadings and facts found by the referee is, whether the relator is entitled to the writ of mandamus prayed for? We do not think so, for two reasons: 1st. The duty required of the commissioners is not such a plain, ministerial duty the performance of which may be enforced by the writ of mandamus. 2d. The duty required of the commission has already been performed, and whether correctly performed or not, cannot be inquired into by mandamus.

It certainly cannot be necessary to cite authorities to show that the duty sought to be enforced by mandamus must be a plain, ministerial duty, not involving the exercise of judgment or discretion, and our first inquiry will be whether the duty imposed upon the commission was a plain, ministerial duty. In 19 Am. & Eng. Enc. of Law, 478, it is said: "A duty is ministerial when the law exacting its discharge prescribes and defines the time, mode, and occasion of its performance with such certainty and precision as to leave nothing to the exercise of judgment or discretion, in contradiction to those in which the officer is permitted to examine whether a thing proposed ought or out not to be done, or whether it ought to be done in one manner or another." And in *State of Mississippi* v. *Johnson*, 4 Wall., at page 498, it is said: "A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." These views have been recognized and followed by this Court in the case of *State* v. *Verner*, 30 S. C., at page 279, where the Court uses the following language: "The general rule is, that mandamus goes to a public officer to enforce the performance of some plain, ministerial duty, but not for the purpose of guiding or controlling his judgment or discretion. It may be used for the purpose of requiring the officer to act, but it cannot be used for the purpose of directing him *how* to

act in the performonce of a duty involving the exercise of judgment or discretion." We must, therefore, inquire whether the duty imposed upon the respondents was a plain ministerial duty, or whether it was a duty involving the exercise of judgment or discretion. It will be observed that the statute above quoted from does not follow precisely the language of the constitutional provision upon the subject, above quoted, for the language used in the statute is, that the commission "shall apportion and divide between the counties of Abbeville and Greenwood the lawful *bona fide* indebtedness of the old county of Abbeville, existing at the time Greenwood County goes into full operation," &c., while the constitutional mandate is that the new county shall bear "a *just* apportionment of the valid indebtedness" of the old county. According to universally acknowledged principles, the rule is, that in such case the statute must, if possible, be given such a construction as will bring it into conformity with the Constitution. Under this rule, the statute must be construed to mean that the commission shall so apportion and divide between the old and new counties the lawful *bona fide* indebtedness of the old county as will make the new county bear a *just* apportionment of such indebtedness. Now, is this duty, thus imposed upon the commission, a plain, ministerial duty, or does its proper performance involve the exercise of judgment or discretion? The first step which it was necessary for the commission to take, and the first step which was taken, was to determine the basis upon which the required apportionment should be made, inasmuch as neither the statute nor the Constitution prescribed any basis upon which the required apportionment must be made, further than that it must be just, and that *one* of the elements to be considered was the indebtedness of the old county existing at the time of the formation of the new county, but what other elements were to be considered, was necessarily to be determined by the judgment of the commission. For, suppose it was ascertained that the indebtedness of Abbeville was any given sum—say

$20,000—it was very manifest that no just apportionment of that amount between the two counties could be made without taking into the calculation some other element; for with such data only, the only possible apportionment that could be made would be to divide the sum equally between the two counties; and this the legislature certainly did not intend, for if they had so intended, it would have been very easy to say so, and, besides, such an apportionment—an equal division—would be sure to work injustice, very probably the grossest injustice, which would be an open violation of the Constitution. Some other element must, therefore, necessarily enter into the calculation. As suggested in the argument of counsel for respondents, there were at least three other elements which might have entered into the calculation: 1st, the population of the respective counties; 2d, the area of each of said counties; 3d, the value of the taxable property in the two counties respectively. One of these three elements, or some other not suggested, had to be selected by the commission; and, as the referee finds, they agreed unanimously upon the third. In this it is clear that the commission necessarily had to exercise their own judgment; for the law imposing upon them the duty of making a just apportionment failed to prescribe *how* such duty should be performed, for while declaring what should be one of the elements necessary to be considered in making the calculation, to wit: the amount of the indebtedness of old Abbeville County existing at the time the now county went into operation, it did not provide what should be another element necessary to be taken into the calculation, and hence that was left to the judgment of the commission. It is clear, therefore, that the duty imposed upon the commission was not such a plain, ministerial duty as can be enforced by mandamus, but that such duty necessarily involved the exercise of judgment or discretion. For this reason the petition must be dismissed.

But, in addition to this, it seems to us that there is another ground fatal to the application of the relator. The

referee has found as a fact—and, indeed, the fact is not disputed—that the full commission met and, after considering the matters referred to them for determination, a majority of the commission apportioned the indebtedness of old Abbeville County between said county and the new county of Greenwood, and embodied their action in a report addressed to the governor and signed by two of the commissioners, Haltiwanger and Graham, which report was filed in the governor's office on the 30th of November, 1897. The fact that this report was not signed by the other commissioner, McMillan, and that he did not agree thereto, cannot affect the question; for the rule is well settled, in this State at least, that where a number of persons are appointed by law to perform some public duty, and they meet together for that purpose, the act of the majority is the act of the body, notwithstanding the dissent of the minority. See *Carolina Savings Bank* v. *Evans*, 28 S. C., 521, and the authorities there cited. The rule was laid down by that great Judge, Shaw, C. J., in *Williams* v. *School District*, 21 Pick., 75, in the following language: "Where a body or board of officers is constituted by law to perform a trust for the public, or to execute a power or perform a duty prescribed by law, it is not necessary that all should concur in the act done. The act of the majority is the act of the body." So the Supreme Court of the United States, speaking through Mr. Justice Strong, in *Cooley* v. *O'Connor*, 12 Wall, at page 398, says: "It is true that when an authority is given jointly to several persons, they must generally act jointly or their acts are invalid. This is a general rule for private agencies, though it is not universal in its application. But the rule is otherwise when the authority is of a public nature, as it was in this case. The commissioners were public agents, clothed with public authority. They were created a board to perform a governmental function, and it is a familiar principle that an authority given to several for public purposes, may be executed by a majority of their number." There can be no doubt that these com-

missioners were appointed to perform a duty of a public nature.  The act authorizing their appointment is, in express terms, declared to be a public act—the officer by whom they were to be appointed is the. highest public officer of the State—the purpose for which they were appointed was of a public nature—to settle any controversy which might arise between two of the political divisions, governmental agencies of the State.  It follows, therefore, that the act of the majority must be regarded as the act of the body.  If this be so, then the duty which the relator asks this Court to enforce by mandamus has already been performed, and for this reason, also, the petition must be dismissed.

Whether the commissioners have erred in the performance of the duty assigned them is not a question which can be considered under a proceeding for mandamus.  If, as we have seen, the duty required of the commissioners is not a plain, ministerial duty, but is a duty involving, as we have also seen, the exercise of judgment and discretion, then the mandamus could only go requiring them to act, but cannot go to direct them how to act.  But if, as we have likewise seen, the commissioners have already acted, then the mandamus cannot go at all.  The fact that the report of the majority of the commission was not filed in. the governor's office until a few days after the respondents were served with the alternative writ, cannot affect the question, for two reasons: 1st, because the act does not require the commissioners to file their report in the governor's office, but only requires them to make the apportionment, and this was done when the report was written out and signed by the two commissioners on the 19th of October, 1897, before this proceeding had been commenced; 2d, but even if the majority of the commissioners cannot be considered as having performed the duty assigned them until the report was filed in the governor's office, surely this Court could not be expected, in the exercise of their discretion (for it is a matter of discretion with the Court—*State* v. *Kirby*, 17 S. C., 566), to issue a writ of mandamus requir-

ing that to be done which has now been done. It is very manifest that the whole object of this proceeding is to require the commissioners to include in the indebtedness of Abbeville County the cost, of the road machines, mules, and harness referred to in the report of the referee, which the relator claims was erroneously excluded by the majority of the commission. But even if the majority of the commission did err in this respect, we do not think such error can be corrected by proceedings in mandamus. We are not to be understood, however, as even intimating that there was any error in this respect on the part of the majority of the commission. For we can very readily understand how, under the facts as found by the referee, the majority of the commission may have very reasonably concluded that, inasmuch as very much the larger part of the cost of these articles had been paid to the vendor, and so entered on the books of the supervisor of Abbeville County some time before the 4th of June, 1897, and inasmuch as Greenwood County never received any benefit from the purchase of these articles, it would not be a "just" apportionment to include the cost of these articles in the amount of indebtedness of Abbeville County on the 4th of June, 1897. But, as we have said, that matter is not before us for decision in this case, and we are not to be considered as *deciding* anything in respect to it.

The judgment of this Court is, that the petition for mandamus be dismissed.