COUNTY OF GREENVILLE v. COUNTY OF SPARTANBURG.

1. ARBITRATION.—The Court should not retry a case submitted to arbitrators, but should sustain the award of a majority of the arbitrators, in absence of fraud, corruption, partiality or gross and palpable mistake apparent on face of award, even where the third arbitrator

could not attend final conference after notice of time and place of meeting.

2. IBID.—POWER OF APPOINTMENT.—Where a county supervisor is authorized by statute to appoint an arbitrator within a fixed time, and so appoints one who declines to act, the appointment of another after time fixed is valid.

3. IBID.—ESTOPPEL.—Where parties deal with an arbitrator as such, they cannot afterwards raise objection to the legality of his appointment.

4. REHEARING will not be granted because overlooking the correction of a typographical error by the Court caused an erroneous statement in the opinion as to admissions by the pleadings, where the Court reached its conclusion independent of such admissions.

Before GAGE, J., Spartanburg, October, 1899.   Reversed.

Action by County of Greenville against County of Spartanburg; W. L. Epps, county treasurer, L. P. Epton, county auditor, and Pelham Mills, to enforce award of arbitrators. The following is so much of the complaint as states the first cause of action, and the answer thereto:

"I. That the plaintiff is a body politic and corporate under the laws of the State of South Carolina.

"II. That the defendant, the County of Spartanburg, is a body politic and corporate under the laws of the State of South Carolina.

"III. That the defendants, W. L. Epps and L. P. Epton, are respectively the duly appointed and qualified treasurer and auditor of the county of Spartanburg.

"IV. That the defendant, the Pelham Mills, is a corporation duly chartered and organized under the laws of the State of South Carolina.

"V. That for many years there has existed a dispute between the counties of Greenville and Spartanburg touching the location of the boundary line between them, beginning at a point on the North Carolina line near Tryon Mountain and running to a point on Enoree River, at or near what is anciently known as Abner's mill.

"VI. That various ineffectual efforts have been made to

compose said dispute, and in view thereof, the General Assembly of the State of South Carolina enacted a joint resolution, approved 5th January, 1895, entitled 'A joint resolution to provide for locating the boundary line between Spartanburg and Greenville counties at and near Pelham factory.' The said joint resolution being set forth in full in Statutes at Large, vol. XXI., page 1143.

"VII. That in compliance with the terms of the said resolution and within six months from the approval thereof, the supervisor of Greenville County, on the         day of        , 1895, appointed I. H. Harrison its surveyor; the supervisor of Spartanburg County on the         day of        , 1895, appointed W. E. Ladshaw as its surveyor, and on the        . day of        , 1896, these two surveyors agreed upon W. J. Kirk as the third surveyor to locate the boundary line as aforesaid.

"VIII. That the said three surveyors went over the line indicated in accordance with the instructions contained in said joint resolution, and on the 11th day of March, 1896, a majority of them, to wit: I. H. Harrison and W. J. Kirk, met at Greenville, notice of said meeting having been previously given to W. E. Ladshaw, the other surveyor, who declined to attend, and agreed upon and filed their report, fully and minutely fixing and locating the disputed boundary line.

"IX. That the said surveyors, before entering upon said survey, notified the supervisors of Greenville and Spartanburg counties of the time when they would begin the location of said boundary line.

"X. That after said surveyors had agreed upon their report they made three separate certificates of the location made by them, one of which they deposited in the office of the county board of commissioners of Greenville and Spartanburg counties respectively, and one in the office of the secretary of state; and in all three of said offices the same were duly recorded.

"XI. That the said surveyors have erected suitable monu-

ments, to wit: granite posts, to preserve the location of said line made by them.

"XII. That it is impracticable to make copies of said report, and the plaintiff craves that reference thereto on file in said offices, be made as often as may be necessary.

"XIII. That the defendant, the county of Spartanburg, declines to recognize the said location as the true boundary line between it and the plaintiff."

The defendants, the county of Spartanburg and W. L. Epps and L. P. Epton, as treasurer and auditor respectively of the said county, answering the complaint herein, by their attorneys, Hydrick & Wilson, respectfully show to the Court:

"I. That they admit the allegations of the paragraphs thereof numbered I., II., III., IV., VI. and XIII., in the first cause of action, and so much of the paragraph numbered III., in the second cause of action, as alleges 'that the auditor and treasurer of Spartanburg County have refused to recognize the said location as to the true boundary line,' and deny all other allegations therein contained, except as hereinafter admitted, explained or modified.

"II. That the joint resolution of the General Assembly referred to in paragraph VI. of the complaint does not, upon a fair interpretation thereof, authorize any change in the location in the boundary line between said counties, which had been previously established by the Constitution and laws of the State, and, in so far as it may be construed as doing so, it is unconstitutional, null and void.

"III. That the terms of said resolution were not complied with in the appointment of said surveyors, and that the surveyors so appointed did not perform the duty with which they were charged in accordance with the directions contained in said resolution.

"IV. That before the work of locating said line was begun, in order to facilitate and expedite the work of gathering the necessary data for the correct location thereof, in

accordance with the terms of said resolution, the said sur-
veyors agreed that they would use two corps—one to be in
charge of Mr. George E. Ladshaw, the surveyor appointed
by the supervisor of the county of Spartanburg, and the
other to be in charge of Mr. I. H. Harrison, the surveyor
appointed by the supervisor of the county of Greenville—
and that the chief of each of said corps should pursue his
own methods, and that, after the field work had been done,
and the field notes worked over and maps and charts made,
they would meet and discuss their differences, if any, with
the third surveyor, Mr. W. J. Kirk, and endeavor to agree
upon the location of said line, in accordance with the terms
of said resolution, it being understood that the said third
surveyor, Mr. W. J. Kirk, would, during the progress of
the work in the field, attend and ascertain the methods and
accuracy of the work done by each corps. That after the
field work had been done, and before Mr. Ladshaw had had
time to work over his notes and prepare the necessary maps
for the final discussion of the question as to the correct loca-
tion of said line, Messrs. Harrison and Kirk met, and, with-
out any notice of time or place of their meeting having been
given to Mr. Ladshaw, they made the report and sketch of
the location of said line mentioned and referred to in the
complaint. That said report bears date March 11th, 1896,
but its true date is April 11th, 1896. That on April 10th,
1896, the said George E. Ladshaw wrote a letter to the said
I. H. Harrison, and thereby notified and informed him, in
substance, that he, the said George E. Ladshaw, could not
be in Greenville until after April 11th, 1896, and that he
would not be able to have his field notes prepared, and the
necessary plats of his work in the field made for conference
and discussion as to the location of said line, until after said
last mentioned date. That said I. H. Harrison received
said letter before said report was adopted and signed, and
that he not only did not notify the said W. J. Kirk of its con-
tents, or of the facts which its contents disclosed, but, on the
contrary, led him, the said W. J. Kirk, to believe that the

said Geo. E. Ladshaw had been duly and regularly notified of the time, place and object of their meeting, and that the said George E. Ladshaw had failed and refused to attend the said meeting, thereby depriving the county of Spartanburg of any representation in the decision upon the location of said line. That said conduct of the said I. H. Harrison and the said conduct of I. H. Harrison and W. J. Kirk, in meeting and deciding upon the location of said line and in adopting and signing report, in the manner and under the circumstances aforesaid, was improper, unfair, partial and contrary to law, and highly prejudicial to the rights and interests of the defendant, the county of Spartanburg.

"IV. a. That the said I. H. Harrison did not have the proper conception of his duties in the premises—that he did not consider or deem it his duty to act fairly and impartially between said counties in the location of said line, but he considered and deemed himself and acted throughout as the representative of the county of Greenville. That the said I. H. Harrison and W. J. Kirk were greatly biased and prejudiced in favor of the county of Greenville and against the county of Spartanburg, and allowed their said bias and prejudice to influence and control their judgment in the location of said line. That governed by their said bias and prejudice and a predetermined intention to locate said line so as to throw the whole of the new mill of the Pelham Mills into Greenville County, without regard to the evidence as to the true and correct location of said line, they wilfully and with the intention to accomplish the purpose aforesaid, ignored and refused to consider the evidence as to the true and correct location of said line at and near Pelham Mills; that the evidence which they so ignored and refused to consider was presented to them; that it was abundant and of the highest and best character—some of it of the same character and other of a higher and better character than evidence which they had sought, received, considered and allowed to control their judgment as to the location of said line at other places; that on account of this said partiality, bias and preju-

dice and their said ignoring and refusal to consider the evidence as to the true location of said line, they did not locate the true boundary line between said counties.

"IV. b. That the said I. H. Harrison and W. J. Kirk were misled in their location of said line, and did not locate the true boundary line between said counties at and near Pelham Mills on account of certain mistakes, to wit: 1st. A mistake on their part in supposing that a certain line, which appeared on a tracing of a plat of certain property of the Pelham Mills, made for their use, was intended to represent the Indian boundary line or the county line. 2d. A mistake on the part of the person who made the tracing of the said plat in putting the said line down thereon as the Indian boundary line or the county line. 3d. A mistake on their part in supposing that any plat of any property of the Pelham Mills showed the Indian boundary line, or the county line, intersecting Enoree River three times. 4th. A mistake on their part in supposing that certain corners of the lands of the Pelham Mills, which are on or near the line located by them, are on the boundary line between said counties, or on the Indian boundary line, and are represented on the plat of the property of the Pelham Mills as being on either one or the other of said lines.

"V. That the work done by Messrs. Harrison and Kirk, their report and sketch of the location made by them, was and is incorrect and inaccurate in many particulars; and especially in that they claimed to have located the line known as the old Indian boundary line; that even if it should be adjudged that the old Indian boundary line is the true boundary line between said counties, then defendants allege that Messrs. Harrison and Kirk did not locate said line, and that upon a correct location thereof, there will be found to be in the county of Spartanburg nearly the whole of the property of the defendant, the Pelham Mills, and a great deal of property, both real and personal, belonging to other corporations and persons living near said line (whose names and the amount and location of whose property are unknown to

these defendants), which has heretofore been returned for taxation in the county of Greenville, and upon which the officers of said county have levied and collected and are now levying and collecting taxes.

"VI. That the true boundary line between said counties is a straight line beginning on the North Carolina line at a stone marked 'S. C.,' on the east side of the Blackstock road, near the Tryon Mountain, and running south one degree and twenty-nine minutes and seven seconds (magnetic) west (August, 1896), until it intersects the Enoree River.

"VII. That the expenses paid by the county of Spartanburg upon the survey amounted to        dollars, and that the county of Greenville is liable for one-half thereof, and is indebted to the county of Spartanburg to that extent, in addition to the taxes heretofore collected by the officers of Greenville County upon property located in Spartanburg County, as aforesaid.

"Wherefore, these defendants pray the report and location made by Messrs. Harrison and Kirk be adjudged null and void, and that they be cancelled of record, and that the true boundary line be located by a commissioner or commissioners appointed by this Court under its instruction, and for such other relief as this Court may deem just and equitable."

The following is the Circuit decree:

"This action was begun in September, 1897. The complaint states four causes of action. The contention before me was only about that first stated; and it was agreed by counsel that the other causes of action should wait on the decision of the first. The suit is to enforce an award made by commissioners. The commission was appointed to locate the boundary line between Spartanburg and Greenville counties at and near Pelham factory, pursuant to act of the General Assembly, approved 5th January, 1895 (21 Stats., 1143-44). The cause was prepared with great elaboration. The testimony is voluminous, very much of it of a scientific

character, and it has covered a wide range. The argument was so thorough and helpful that I have found little difficulty in arriving at a conclusion.

"It was conceded on both sides that the commission undertook to do more than the statute directed; it undertook to locate the line betwixt Greenville and Spartanburg from the State line on the north, south some 22 miles to Enoree River; the statute only directed the commission 'to locate the boundary line between Spartanburg and Greenville counties at and near Pelham factory.' Pelham factory is located on Enoree River, at the southern terminus of the artificial line run by the commission. The history of the controversy is, that the taxable values at Pelham gave rise to the dispute; so that the act was passed to rightly locate those values, and for no other purpose. Manifestly, therefore, all the work of the commission which undertook to locate a boundary line at points other than 'at and near Pelham factory,' is of no legal force. So that the only question is, shall the line located by the commission at and near Pelham factory be approved and confirmed? The authority of the commission lies at the threshold of the action. The act provides 'that within six months after the approval (thereof) by the governor, the supervisors of Greenville County and Spartanburg County shall each appoint a surveyor, which two surveyors, etc.' The governor signed his approval on 5th January, 1895, and six months thereafter expired, 5th July, 1895. The county of Spartanburg, within the time prescribed, appointed George E. Ladshaw surveyor; the county of Greenville within like time appointed O. J. Bond surveyor. Bond was unable to act when the time to make the survey arrived, and after the 5th July, 1895, the county of Greenville appointed in Bond's stead, one I. H. Harrison surveyor. At some time, about Christmas, 1895, Ladshaw and Harrison called in Wm. J. Kirk as the third surveyor. The work of location was begun by the three surveyors on 10th March, '96, and was completed in about one month therafter. The lack of power in the supervisor of Greenville to appoint a

8—62

surveyor after 5th July, 1895, is now first asserted. In this case, I incline to the opinion Harrison's action is not vitiated by reason of his belated appointment. Under other circumstances, the question would be a serious one. Nor do I agree that the report is of no force because signed by only a majority of the surveyors. The three surveyors had a public duty to perform; and the action of a majority, after conference and consideration, is in such case a valid action. *Abbeville* v. *McMillan*, 52 S. C., 72 and 73. But was the report made after meeting and after considering the matters referred to the surveyors? The testimony is conclusive, that in the field survey the three surveyors had little conference, and that after that survey, they had no conference and no consideration of the matter referred to them. In the field survey, Mr. Harrison organized and operated his own corps, separate and apart from Mr. Ladshaw; and Mr. Ladshaw did likewise. Mr. Kirk took no active part in that business, but was generally in the company of Mr. Harrison's party, and sometimes with Mr. Ladshaw's party. This arrangement arose partly out of a different conception, by Harrison and Ladshaw, of character of the line to be located; but it was also due to a misconception of both men of the necessity of conference and of consideration in such matters. The field work was completed in March, 1896, and the surveyors dispersed. On April 1st, Mr. Ladshaw, by letter, advised Mr. Harrison that he was ready for a conference. On April 6th, Mr. Harrison, by letter, advised Mr. Ladshaw to meet him at Greenville on Thursday, 9th April, or Friday, 10th April. On April 10th, Mr. Ladshaw, by letter, advised Mr. Harrison of his inability to meet him at the time designated and assigned reasons therefor, and he did not go. On 11th April, on Saturday, in the afternoon, Mr. Harrison and Mr. Kirk signed the report in the city of Greenville. Mr. Ladshaw's letters were written from Spartanburg, Mr. Harrison's from Walhalla. The award thus made is that which the plaintiff asks to be enforced. It was made without a conference of the three surveyors, and without a rea-

sonable opportunity for a conference; it was made without the joint and necessary consideration of the three men, and without a reasonable opportunity therefor.    It is, therefore, not such an award as was contemplated by the statutes, and is not such an one as a court of equity ought to enforce.

"I am satisfied the failure of the surveyors to meet and confer was not due to any unworthy desire to take advantage, the one of the other; but that it resulted from a lack of conception of the grave  duties to be performed, and the way in which they should have been performed.    I cannot concur with plaintiff's opinion, that Mr. Ladshaw's fundamental conception of the line to be run was so different from that of Mr. Harrison's as to render a conference unnecessary.    If the fact be that these men differed at the start so radically as to render concurrence or modification of their views impossible; in that event, the action of Mr. Harrison and Mr. Kirk might stand.    But the testimony does not warrant the finding of that fact.    The report of Mr. Harrison does not so state the fact; and Mr. Harrison testified that he never told Mr. Ladshaw that he disagreed from his principle, for it was not his business to do so, as he did not want to criticise his work.    Mr. Kirk testified that Mr. Ladshaw did not explain his system while in the field, that he did not ask Ladshaw for any information, believing that after the survey was completed, in the conference he would have a talk over that matter.    Mr. Ladshaw testified that at the Block house, in the beginning of the survey, Mr. Harrison said each party could survey according to his own methods, and they could thereafter confer.    All parties, therefore, at the start, expected a conference; and a conference at Greenville, on the 9th or 10th April, was actually arranged for, but as hereinbefore stated, was not had.    The difference between Ladshaw and Harrison consisted chiefly in a construction of the statute from which they derived their powers.    The former was of opinion the statute directed the location of a straight line southward from the Block house on the State line to Enoree River at Abner's

mill.     The latter was of opinion the statute directed the loca-
tion of the true boundary line betwixt the counties, without
reference to straightness.     They only divided on the law.
The act refers to the Rev. Stats. of 1893 for a description of
the course and length of the line of division, and in this lan-
guage: 'In accordance with the marks, courses and distances
set out in sections 419 and 433 of the Gen. Stats. of 1882,
being sections 478 and 492 of the Rev. Stats. 1893.'     The
description of the Rev. Stat. is as follows, to wit: 'A line
commencing on the N. C. line at stone marked "S. C." on
the east side of Blackstock road near the Tryon Mountain,
and running (S. 2 degrees east) 22 miles and 64 chains, or
until it intersects the Enoree River at Abner's mill on said
river.'     The description of the line is the same, both in that
section bounding Greenville and that section bounding Spar-
tanburg, except in the last named section, after Abner's mill,
are added the words 'on said river.'

"And this brings us to the real controversy, is the line laid
down by the report the true line of division between the
counties?     It is manifest, and was conceded on all sides,
that the act of 5th January, 1895, could not and did not
direct any change in the line; for the line was fixed by the
Constitution of 1868 (art. II., sec. 3), and it could not be
changed by statute.     It is also reasonably manifest, and such
view was not contested seriously, that the description of the
line in the General and Revised Statutes, S. 2 degrees E.
from a given point to another given point, does not necessa-
rily mean a scientifically straight line.     It was also practi-
cally conceded by all parties, that the true line of division
is the goal desired, and that such true line is what is known
as the Cherokee Indian boundary line, and it is crooked.
The plaintiff contends that the report of the commission is
final, as to the true line.     It is true that in some instances
the award is final, and neither side will be heard to question
its correctness.     It is true that as a general rule a Court
will not review the findings of an award.     But if there be a
clear error, and if the action be in equity to enforce the

award, in that case a Court will not hesitate to set aside the award. The truth is, no rule of action can be laid down, except a rule so general as to mean nothing.

"The question here is, shall this award be enforced? Not if the testimony shows it to be clearly wrong. I am thoroughly satisfied from the testimony of Mr. Harrison, that his paper line would not conform to a paper line of the Indian boundary; and that his line actually put on the ground with stone monuments, is not such a one as conforms to the Indian boundary line there now present; and that the monuments erected by him are of so little value, that they are not 'suitable monuments to preserve the location,' because if removed they could not certainly be set in the same place they now occupy. There is no doubt about the starting point on the North Carolina line; the Revised and General Statutes give the course from there, and the distance; there is grave doubt about Abner's mill, the southern terminus of the line on Enoree River; and a scientifically straight line S. 2 degrees E. from the starting point, is confessedly a wrong line of division. There was a survey of the State made by James Cook, some time before 1771, pursuant to an act of the Council Chamber, passed 18th April, 1767. 4 Stats., p. 262. A copy of that survey may be seen in I. Carroll's Historical Collections. It shows the Cherokee Indian boundary line to be a line running south from the N. C. line, and intersecting on Reedy River another line running northeast from the Tugeloo River. The last line is the boundary betwixt Abbeville and Anderson counties. Therefore, the county of Spartanburg was organized pursuant to an act passed 12th March, 1785 (4 Stats., 661). That act describes the westward boundary of Spartanburg to be the 'Indian boundary line.' At that time the territory immediately to the westward of that line belonged no longer to the Cherokees, but had been ceded by them to the State about 1777 (Mills' Statistics, p. 672). The present Greenville was a part of that ceded territory. Thereafter, the county of Greenville was organized, pursuant to an act passed 22d March, 1786 (7

Stats.). The act refers to the territory organized into Greenville as the new ceded lands, and describes one of the boundaries to be 'the old Indian boundary.' It is not manifest where the statute got a description of the line; it first appears in the General Statutes of 1872, pp. 139 and 143. The supposition of counsel is, that the description there found was taken from Mills' Statistics, page 724, a work published by Robert Mills, about 1825. Mills' map, made in the early twenties, as a part of his statistics, describes the southern terminus of the line as 'Hutchings' mill and cotton factory,' and not Abner's mill. The map does not give the course found in the statute nor the distance, nor does it specify any course or any distance. The scale shows the distance to be a fraction less than 22 miles. Manifestly the statute of 1872 could not change the line confirmed by the Constitution of 1868 (art. II., sec. 3). I have found no law, enacted before 1868, adopting the description found in Mills' Statistics. There is a statute, passed about the time of the Mills' survey, giving certain persons then making a survey of the State, and not named, access to the public records at Columbia. 6 Stat., 76. I conclude, therefore, that Mills' Statistics is only an historical work, and the description given there of the disputed line is not of binding force. Mills' atlas throws no light on it, except it shows Hutchings' mill to be on the Greenville side. I have found no statute which changes the boundary described in these two acts, the one of March, 1785, and the other March, 1786.

"My conclusion, therefore, is that the old Indian line of Cook's survey is the true line betwixt the counties, without reference to the course named in statute and without reference to Abner's mill. If that be so, and if the line located by the report does not conform thereto, then the report is wrong, and the award cannot be enforced. It may be that the Harrison line is in the neighborhood of the Indian boundary; but the very object of this survey was accuracy. It is admitted on all hands that a part of the Pelham mills lies in Greenville; the contest is about the mill erected in the past

ten years, where does it lie? All the surveyors testify the Indian line can be accurately laid down; it is not case for approximations. It would be unprofitable to go through the testimony to show the character of the survey. It satisfies me that the work was not done with exactness, that in several instances it is manifestly erroneous, and as a permanent work it is of no value. And this leads me to a consideration of the last question, to wit: shall the report be recommitted or rejected; and if rejected, shall new commissioners be named to locate the true line?

"I am of the opinion it would not be wise to recommit the matter to the three gentlemen who have already made the attempt at location. There is some authority for the appointment of a new commission to execute the work; but in this case the defendant is in possession of the disputed territory, and has nothing to complain of. The plaintiff resists the appointment of commissioners by the Court, on the ground that the location of the county line is a question of policy for the law-making power, and not of law for the judiciary. But in this State the same organic law which created the law-making power and the Court, created also the counties and set their boundaries. There is as little authority for the legislature to intervene as for the Court to do so. I incline to the opinion, that what is a true county line is under our Constitution a question of law, and not of policy. However, without reference to the legal rights of either side to have a direction by the Court to new commissioners, I think a right adjustment of the controversy can be best and quickest reached by vacating the award, and stopping there. Wise counsel and mutual co-operation can do the rest.

"It is, therefore, ordered, adjudged and decreed, that the award made herein by I. H. Harrison and W. J. Kirk, dated 11th April, 1896, be, and the same is hereby, set aside and made null and void.

"It is further ordered, that the complaint be dismissed."

From this judgment the plaintiff appeals.

*Messrs. Ansel, Cothran & Cothran* and *T. K. Earle,* for appellant. *Mr. Earle* cites : *Award should not be set aside in absence of fraud, irregularity, improper conduct, or gross error:* 58 S. C., 313 ; 2 Ency., 2 ed., 773, 766, 775, 778, 779, 781, 787 ; 2 Bay, 370 ; 1 Ency., 1 ed., 692, 693 ; 27 S. E. R., 308 ; 13 How., 40 ; Am. Dig., 1898, p. 1529 ; 90 Me., 235 ; 52 Conn., 175 ; 9 Am. & Eng. Corp. Cas., 1 ; 76 Me., 28 ; 13 How., 350 ; 3 Rich. Eq., 21 ; 2 Story Eq. Jur., 1453, 1454, 1455, 1456 ; Pom. Eq. Jur., 839. *Not necessary for all three surveyors to be present at final conference:* 1 Ency., 1 ed., 684 ; 5 Am. Dec., 186. *Court may recommit or reject award:* 1 Ency., 1 ed., 711. *Defendant having acted with surveyor, cannot now object to his appointment as illegal:* 12 S. E. R., 812 ; 1 Ency., 1 ed., 673.

*Messrs. D. E. Hydrick* and *Stanyarne Wilson,* contra, cite : *Failure to hold a conference vitiates the award of the majority:* 1 Am. Dec., 195 ; 1 Bay, 348 ; 4 Am. Dec., 738 ; 1 Ency., 1 ed., 680-1, 683-85, and notes ; 2 Ency., 2 ed., 641-2, and notes, 649, 666, 646, and notes ; 13 S. C., 510 ; 87 Am. Dec., 723 ; Morse on Ar., 119 ; 1 McC. Ch., 478 ; 2 Brev., 380 ; 18 S. E. R., 88. *County lines are fixed, and since the line located changes the original line, the award was properly set aside:* Con. 1868, art. II., sec. 3 ; art VIII., secs. 2 and 7 ; Con. 1895, art. VII., secs. 7 and 12 ; 19 Ency., 1 ed., 478 ; 1 Ency., 1 ed., 658-9, and notes ; 13 S. C., 508 ; 80 Am. Dec., 59 ; 7 Wall., 188 ; 5 Wall., 419, 785 ; 2 McC. Ch., 484 ; 1 Ency., 2 ed., 673-4, and notes, 706-709 ; 2 Ency., 2 ed., 635, 636, 638-9 ; 13 Rich. Eq., 12 ; 1 Brev., 239 ; 2 Bay, 370, 450 ; 6 S. C., 43 ; 13 S. C., 510 ; 58 S. C., 299 ; 15 Pet., 233. *Proper to refuse to recommit:* 1 Ency., 1 ed., 689 ; 1 How., 660. *Location of county line is a question of law for Courts and not one of policy for legislature:* 9 S. C., 4 ; 5 S. E. R., 198 ; 4 Ency., 1 ed., 345, and notes, 350, and notes, 351, and note 4 ; 1 Swan., 236. *Appointment of arbitrator after expiration of time fixed in resolution is error:* 1 McC. Ch., 92 ; 1 Ency., 688-9 ; 2 Ency., 2 ed., 547, 589, 601, and notes.

This opinion was filed August 1, 1901, but remittitur held up on petition for rehearing until

November 29, 1901.   The opinion of the Court was delivered by

MR. JUSTICE JONES.   This action was instituted to enforce an award by a board of surveyors appointed under the provision of a joint resolution of the General Assembly, approved January 5, 1895, providing for the location of the boundary line between Greenville and Spartanburg counties, at and near Pelham factory.   This appeal comes from the decree of Judge Gage, dismissing the complaint, which decree is officially reported herewith.   For a full statement of the issues presented by the pleadings, the Reporter will insert in his report hereof a copy of the complaint as to the first cause of action, which alone concerns this appeal, and a copy of the answer thereto.   The three surveyors appointed were Geo. E. Ladshaw, appointed by the supervisor of Spartanburg County, I. H. Harrison, appointed by the supervisor of Greenville County, and William J. Kirk, chosen by the two above named surveyors.   These surveyors, on March 10, 1896, met at the stone near Tryon Mountain, and from that point began the work of location.   The surveyors differed at the outset as to what they were required to do under the joint resolution.   The joint resolution, 21 Stat., 1143, enacted that the "three surveyors shall locate the boundary line between Spartanburg and Greenville counties, at and near Pelham factory, in accordance with the marks, monuments, courses and distances set out in sections 419 and 433 of the General Statutes of 1882, being sections 478 and 492 of the Revised Statutes of 1893, vol. I."   The description of the boundary line between Greenville and Spartanburg counties contained in sec. 492, *supra,* is as follows: "Commencing on the North Carolina line at a stone marked 'S. C.' on the east side of Blackstock's road near Tryon Mountain and running south 2 degrees east twenty-two miles and sixty-four chains, or until it intersects the Enoree River at

Abner's mill on said river, &c." Ladshaw's view was that the statute required a survey of a new and straight line on the statutory course, with declination of needle reduced to the time of Salman's survey in 1820, while Harrison's view was that the statute required a location or retracing of the old line between the counties known as the Indian boundary, which was described as south 2 deg. east. Kirk agreed with Harrison's view. Two corps were organized, one under Ladshaw and one under Harrison, and each party proceeded to "locate" the line according to his plan, with a view to a conference afterwards. During the survey, Kirk seems to have been sometimes with Ladshaw's party but generally with Harrison's. No conference was had along the line among the three surveyors, except once at the stone at Gap Creek road, which Harrison and Kirk, upon the testimony taken, concluded was a mark of the Indian boundary line which they were endeavoring to locate. Ladshaw completed his line about March 28th, 1896, and left the field, while Harrison and Kirk remained a day or two longer. On April 1, 1896, Ladshaw wrote to Harrison as follows: "Having completed my preliminary survey and working over my notes, shall be ready for a conference with yourself and Capt. Kirk when you shall have gotten ready with your work. Please advise me." By registered letter, dated April 6, 1896, Harrison wrote in reply: "I will be glad to meet you in Greenville on Thursday, 9th, or Friday, 10th, next, as Mr. Kirk writes me you will be absent on Wednesday next. Will remain in Greenville until Saturday evening, 11th. Will take until that time to finish plats, &c." To which Ladshaw by letter, dated April 10th, 1896, replied: "Your favor of the 6th inst. at hand and noted. I am sorry that business engagements made some time ago will preclude the possibility of my reaching Greenville for several days, also my brother and partner is sick, and we have been unable to prepare the work for inspection as yet. Will write you again as soon as possible." Kirk, who resides at Cokesbury, in Greenwood County, was in Greenville on the

9th and 10th for a conference, having been notified by Harrison. Harrison, in his testimony, at folio 337, says: "On the 11th, Mr. Kirk came to my room and asked me if I had heard anything from Mr. Ladshaw. I told him I had not. That was early on the 11th, and he says: 'Well, what do you propose to do?' and I told him I didn't know whether to wait any longer or not. A young lady had prepared these reports. I was done, and got the copies and read them over. After doing that, we signed them. He carefully read that report himself and examined this original there. I don't know whether this is the one or not. I made three of them." At folio 115, when asked whether he received Ladshaw's letter before he made and filed those reports, Harrison answered: "I received that letter there—I believe I did, I won't be positive—I suppose I did, though." And at folio 188, Harrison states that he thinks he got the letter after he left Greenville. The reports were filed some time after the 11th, and this may explain the apparent inconsistency between the statements of Mr. Harrison. We conclude upon the whole testimony that at the time of the making of the award by Harrison and Kirk in the absence of Ladshaw, Harrison had not received the letter of Ladshaw. The Circuit Judge in his decree says: "I am satisfied the failure of the surveyors to meet and confer was not due to any unworthy desire to take advantage the one of the other; but that it resulted from a lack of conception of the grave duties to be performed, and the way in which they should have been performed."

In view of the foregoing, we think appellants' first exception is well taken and must be sustained. That exception is as follows: "Because the Circuit Judge erred in holding that the award of the surveyors was made 'without a reasonable opportunity for a conference; it was made without the joint and necessary consideration of three men, and without a reasonable opportunity therefor;' whereas, the testimony clearly shows, and the Judge should have held, and erred in not holding, that each of the sur-

veyors had due, definite and sufficient notice of the time and place of the conference to be held, to wit: in the city of Greenville, S. C., on April 8th, 9th, 10th and 11th, 1896; and the Judge erred in not holding that, under these circumstances, Harrison and Kirk could legally meet and make the report and award, in the absence of Ladshaw, they being a majority of the board—especially so, when the testimony shows that they had remained in Greenville several days under said appointment and hearing nothing from Ladshaw." Whatever may be the rule elsewhere, the rule in this State is that an award by a majority of arbitrators is valid, whether the matter submitted be private or under a rule of Court. *Lockart* v. *Kidd,* 2 Mills, 217; *Leatherwood* v. *Woodroof,* 2 Brev., 380; or by contract of the parties— *Black* v. *Pearson,* 1 McCord, 137; or whether the matter be public, as in this case—*Abbeville* v. *McMillan,* 52 S. C., 72. In all cases, however, the arbitrators should confer; but if after due notice one of the arbitrators fail for any reason to attend the appointed conference, the majority may lawfully proceed to make the award. In 2 A. & E. Enc. Law, 645, it is stated, with numerous citations: "Where the submission provides for the appointment of two arbitrators, who are to choose a third to act with them, if one of the arbitrators, for any reason, stays away from the meetings, unless it be by fraud on the part of the other arbitrators or the parties, after he has received due notice, and has been given an opportunity to attend, the others may decide without him, and their award be upheld." In this connection we call attention to the allegation in the 8th paragraph of the complaint, expressly admitted in 1st paragraph of the answer, viz: "That the said three surveyors went over the line indicated in accordance with the instructions contained in said joint resolution, and on the 11th day of March, 1896, a majority of them, to wit: I. H. Harrison and W. J. Kirk, met at Greenville, notice of said meeting having been previously given to W. E. Ladshaw, the other surveyor, who declined to attend, and agreed upon and filed their report,

fully and minutely fixing and locating the disputed boundary line." The object of submitting a controversy to arbitrators is to secure a settlement of the matter in dispute by a tribunal of the parties' own choosing, which shall do substantial justice without being restricted by the technical rules of law. Courts favor awards and will indulge every reasonable presumption to uphold them, and whoever assails them has the burden of clearly establishing their invalidity. The joint resolution manifestly contemplated a final settlement of the boundary dispute, and provided for a tribunal to be selected by the disputants. The same general rules, therefore, must be observed in this case as in the case of an award by arbitrators appointed under a rule of Court or by contract of the parties. To avoid an award, the resisting party must show that the arbitrators (1) exceeded their power, in which case the award may nevertheless be held valid as to the separable part of the award which is within the terms of submission, *McCall* v. *McCall,* 36 S. C., 86; or (2) there must be shown fraud, corruption or partiality on the part of the arbitrators; or (3) some gross and palpable mistake of law or fact, appearing on the face of the award, or by admission of the arbitrators, which materially affected the award and made it operate contrary to the intention of the arbitrators. *Alwyn* v. *Perkins,* 3 DeS., 296; *Mulder* v. *Cravat,* 2 Bay, 370; *Askew* v. *Kennedy,* 1 Bail., 46; *Aiken* v. *Bolan,* 1 Brev., 239; *Shiver* v. *Ross,* 1 Brev., 293; *Bollman* v. *Bollman,* 6 S. C., 42; *Rounds* v. *Mfg. Co.,* 58 S. C., 333. The cases distinctly hold that the Court will not retry the matter submitted to arbitration on its merits. The testimony will not justify a conclusion that there was any fraud, corruption or partiality on the part of the arbitrators, and we do not understand that the Circuit Court so held. As it seems to us, however, the Circuit Court fell into the error of practically retrying the dispute submitted to the arbitrators and refusing to enforce the award, because upon the testimony taken at the trial he reached the conclusion that the disputed boundary had not been accurately located. There

was no mistake of law on the part of the arbitrators, for the Circuit Court, as we think correctly, agreed with the view of Harrison and Kirk that it was their duty under the statute to locate the old Indian boundary, and the report of Harrison and Kirk shows that they had located such boundary. Whether the boundary was correctly located upon the evidence submitted to the arbitrators, was for the determination of the arbitrators, as the triers of such facts. Such was the dispute they were called upon to finally settle, and in the absence of any showing of fraud, corruption or partiality, or gross and palpable mistake appearing on the face of the award, it must be held conclusive. The foregoing conclusions will render it unnecessary to further notice the exceptions by appellant.

We will notice a ground urged by the respondent, after proper notice, in support of the decree, viz: that the surveyor appointed on behalf of Greenville County, I. H. Harrison, was not appointed within six months after the approval of the joint resolution, and, therefore, that the board of arbitrators was not legally constituted. Upon this matter the Circuit Court finds that Spartanburg County within the prescribed time appointed Ladshaw, and Greenville County within like time appointed O. J. Bond; that Bond was unable to act when the time to make the survey arrived, and after the 5th July, 1895, Greenville County appointed Harrison in Bond's stead. We hold with the Circuit Court, that Harrison's appointment was valid. The parties have dealt with Harrison as arbitrator throughout the proceedings without objection, and cannot now be heard to object.

The other grounds urged by respondent in support of the decree have been sufficiently considered by what has been already said and are overruled.

The judgment of the Circuit Court is reversed, and the cause remanded for further proceedings.

Petition for rehearing was refused, November 29, 1901, in the following order:

PER CURIAM.   After careful consideration of this petition, we are unable to discover that any material fact or principle of law has either been overlooked or disregarded, and hence there is no ground for a rehearing.

It is, therefore, ordered, that this petition be dismissed and the stay of the remittitur heretofore granted be revoked.

While it is quite true that the correction of a typographical error in the "Case" was not noticed at the time of the preparation of the opinion, by which an erroneous statement was made in the opinion as to certain supposed admissions in the pleadings, yet as the Court has reached its conclusion entirely independently of such supposed admission, the error was manifestly immaterial.